LawClerk:Anderson, SEALED, TERMINATED,

# U.S. District Court
## District of Oregon (Portland (3))
## CIVIL DOCKET FOR CASE : 3:16–cv–02065–YY *SEALED*

United States of America et al v. Universal Health Services, Inc. et al

Assigned to: Magistrate Judge Youlee Yim You

Cause: 31:3729 False Claims Act

Date Filed: 10/27/2016

Date Terminated: 07/06/2017

Jury Demand: Plaintiff

Nature of Suit: 376 Qui Tam (31 U.S.C. § 3729(a))

Jurisdiction: U.S. Government Plaintiff

**Plaintiff**

**United States of America**
*ex rel Carrie Eborall*

represented by **Alexis Lien**
U.S. Attorney's Office, District of Oregon
1000 SW Third Avenue
Suite 600
Portland, OR 97204
503–727–1098
Fax: 503–727–1117
Email: alexis.lien@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Plaintiff**

**Carrie Eborall**

represented by **Brian H. Mahany**
Mahany Law
8112 West Bluemound Road
Suite 101
Wauwatosa, WI 53213
414–258–2375
Fax: 414–777–0776
Email: brian@mahanylaw.com
*LEAD ATTORNEY*
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Russell D. Garrett**
Jordan Ramis, P.C.
Two Centerpointe Drive, 6th Floor
Lake Oswego, OR 97035
503–598–5519
Fax: 503–598–7373
Email: russ.garrett@jordanramis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Roger A. Lenneberg**
Jordan Ramis, P.C.
Two Centerpointe Drive, 6th Floor

Lake Oswego, OR 97035
503–598–7070
Fax: 503–598–7373
Email: roger.lenneberg@jordanramis.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Universal Health Services, Inc.**

**Defendant**

**Cedar Hills Hospital**

**Defendant**

**UBH of Oregon, LLC**

Email All Attorneys

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 10/27/2016 | 1 | 4 | Complaint. Filing fee in the amount of $400 collected. Receipt No. 69784. Jury Trial Requested: Yes. Filed by Carrie Eborall against Cedar Hills Hospital, UBH of Oregon, LLC, Universal Health Services, Inc. (Attachments: # 1 Exhibits To Complaint, # 2 Civil Cover Sheet). (cib) (Entered: 10/31/2016) |
| 10/27/2016 | 2 | 66 | Motion to Seal the Case. Filed by Carrie Eborall. (Attachments: # 1 Memorandum In Support) (cib) (Entered: 10/31/2016) |
| 10/27/2016 | 3 | 70 | Notice of Case Assignment to Magistrate Judge Youlee Yim You and Discovery and Pretrial Scheduling Order. **NOTICE: Counsel shall print and serve the summonses and all documents issued by the Clerk at the time of filing upon all named parties in accordance with Local Rule 3–5**. Discovery is to be completed by 2/24/2017. Joint Alternate Dispute Resolution Report is due by 3/27/2017. Pretrial Order is due by 3/27/2017. Ordered by Magistrate Judge Youlee Yim You. (cib) (Entered: 10/31/2016) |
| 10/27/2016 | 4 | 77 | Motion for Leave to Appear Pro Hac Vice *for Attorney Brian H. Mahany*. Filing fee in the amount of $300 collected; Receipt No.: 69785. Filed by Carrie Eborall. (ecp) (Entered: 10/31/2016) |
| 11/01/2016 | 5 | 81 | **ORDER:** Granting Application for Special Admission *Pro Hac Vice* of Brian H. Mahany for Carrie Eborall. Application Fee in amount of $300 collected. Receipt No. 69785 issued. Signed on 11/1/2016 by Magistrate Judge Youlee Yim You. (ecp) (Entered: 11/01/2016) |
| 11/01/2016 | 6 | 85 | Notification of CM/ECF Account for Brian H. Mahany (*Pro Hac Vice* admission). Your login is: **bhmahany**. Go to the CM/ECF login page to set your password. (ecp) (Entered: 11/01/2016) |
| 11/03/2016 | 7 | 86 | Clerk's Notice of Mailing regarding Notification of New CM/ECF Account, 6 emailed to attorney Brian Mahany. Order on Application for Special Admission Pro Hac Vice, 5 emailed to all parties. (ecp) (Entered: 11/03/2016) |

| 11/04/2016 | 8 | 87 | **ORDER** by Magistrate Judge Youlee Yim You: **GRANTING** Motion to Seal the Case (# 2 ). (eo) (Entered: 11/04/2016) |
|---|---|---|---|
| 11/04/2016 | 9 | 88 | Clerk's Notice of E–Mail service: Notice of the order granting motion to seal case (# 8 ) was e–mailed to plaintiff's counsel. (eo) (Entered: 11/04/2016) |
| 01/10/2017 | 12 | 89 | Clerk's Notice of emailing to Alexis A. Lien regarding Exparte, Order on motion for extension of time, Order on Motion – Miscellaneous 11 . (pvh) (Entered: 01/10/2017) |
| 06/30/2017 | 13 | 90 | Unopposed Motion to Transfer Venue. Filed by United States of America. (cib) (Entered: 07/05/2017) |
| 07/05/2017 | 14 | 99 | **ORDER TRANSFERRING VENUE.** Signed on 7/5/2017 by Magistrate Judge Youlee Yim You. (pvh) (Entered: 07/06/2017) |

**Russell D. Garrett**, OSB # 882111
E-mail: russ.garrett@jordanramis.com
**Roger A. Lenneberg**, OSB # 842733
E-mail: roger.lenneberg@jordanramis.com
JORDAN RAMIS PC
Attorneys at Law
Two Centerpointe Dr 6th Flr
Lake Oswego OR 97035
Telephone: (503) 598-7070
        Attorneys for Plaintiff Carrie Eborall



# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

### PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel. CARRIE EBORALL**, | Case No. 3:16-cv-2065-YY |
| Plaintiff, | **COMPLAINT** Claims Pursuant to the False Claims Act, 31 USC sec. 3730 |
| v. | |
| **UNIVERSAL HEALTH SERVICES, INC.; CEDAR HILLS HOSPITAL; and UBH OF OREGON, LLC**, | Jury Trial Demanded – Filed Under Seal 31 U.S.C. § 3730(b)(2) |
| Defendants. | **[FILED IN CAMERA AND UNDER SEAL]** |

The United States of America, by and through *qui tam* originating relator Carrie Eborall

("Relator" or "Eborall"), hereby brings this action pursuant to the False Claims Act ("FCA"), as

amended, 31 U.S.C. § 3729 et seq., by and through her attorneys, Brian H. Mahany and the Law

Firm of Mahany Law, and hereby declares the following to recover all damages, penalties, and

other remedies available as established by the FCA, which damages were caused by Defendants'

Page 1 - COMPLAINT

69784

repeated and deliberate submissions of false, fraudulent and intentionally deceptive records, claims, statements and representations, used and caused to be made, used and relied upon by the United States Government under and through its Medicare, TRICARE, and other government funded health care programs.

As will be set forth with greater specificity below, the Defendants knowingly submitted false claims to the federal government through its Medicare and TRICARE programs for medically unnecessary services, including unnecessarily extending hospitalizations by up to five times longer for a Medicare covered patient than a patient that had private insurance coverage. This was done solely to increase the amount of government reimbursement payable to the Defendants. Many of the claims for payment were fabricated or were falsified in order to obtain payments that the Defendants were not entitled to receive.

## THE PARTIES

1.  Plaintiff is the United States of America.

2.  Plaintiff-Relator Carrie Eborall ("Eborall") is an Oregon resident and was previously employed at Cedar Hills in the utilization review department. She worked continuously for Cedar Hills from approximately March 2011 through March 2015. As a result of her employment at Cedar Hills, Relator witnessed the fraud alleged in this Complaint and is the original source of this information.

3.  Cedar Hills Hospital ("Cedar Hills") is a hospital that is located at 10300 SW Eastridge Street, Portland, Oregon 97225. Its authorized representative is Steve Page, who is located at 280 Madison Avenue, Suite 305, New York, New York 10016. Its registered name is UBH of Oregon, LLC, which is located at 10300 SW Eastridge Street, Portland, Oregon 97225.

4.  Defendant Universal Health Services, Inc. ("UHS") is a holding company that operates through its subsidiaries including its management company, UHS of Delaware, Inc. It is located in Pennsylvania. UHS operates more than 240 acute care hospitals, behavioral health

Page 2 - COMPLAINT                                    53518-75290 2430986_1\RMH 10/27 2016

facilities, and ambulatory centers. UHS owns Cedar Hills.

5.      Defendant UBH or Oregon, LLC is a Delaware limited liability company. Its principal place of business is 10300 SW Eastridge Street, Portland, Oregon 97725 and its registered agent is CT Corporation System, which is located at 388 State Street, Suite 420, Salem, Oregon 97301. Upon information and belief, UHS is the sole owner of UBH of Oregon, LLC and Cedar Hills Hospital.

6.      Upon information and belief, UBH of Oregon, LLC operates as Cedar Hills.

7.      Cedar Hills was previously owned and operated by Ascend Health Corporation. At the time UHS acquired Ascend Health Corporation, Ascend operated nine psychiatric facilities, including Cedar Hills.

8.      Cedar Hills is a for-profit hospital and provides acute hospitalization for behavioral health issues.

9.      All of the Defendants have benefitted from the pattern and practices stated below.

**JURISDICTION AND VENUE**

10.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732, the latter of which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. §§ 3729 and 3730. Plaintiff-Relator establishes subject matter jurisdiction under 31 U.S.C. § 3730(b).

11.      This Court has jurisdiction over the Defendants and is a proper venue pursuant to and 31 U.S.C. § 3732(a). Defendants UBH of Oregon, LLC and Cedar Hill's principal place of business is in this District.

12.      Venue is proper in this District as a substantial part of the events or omissions giving rise to the claim occurred and Cedar Hill's and UBH of Oregon, LLC are located in this District. 28 U.S.C. § 1391(b).

53518-75290 *2430986_1 RMH 10/27 2016*

## FEDERAL FALSE CLAIMS ACT

13.     The False Claims Act, 31 U.S.C. §§ 3729-3733, provides, inter alia, that any person who (1) "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval," or (2) "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim," is liable to the United States for a civil monetary penalty plus treble damages. 31 U.S.C. § 3729(a)(1)(A)-(B).

14.     The terms "knowing" and "knowingly" are defined to mean "that a person, with respect to information (1) has actual knowledge of the information; (2) acts in deliberate ignorance of the truth or falsity of the information; or (3) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A)(i)-(iii). Proof of specific intent to defraud is not required. 31 U.S.C. § 3729(b)(1)(B).

15.     The term "claim" means "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property, that (1) is presented to an officer, employee, or agent of the United States; or (2) is made to a contractor, grantee, or other recipient, if the money or property is to be spent or used on the Government's behalf or to advance a Government program or interest, and if the United States Government (a) provides or has provided any portion of the money or property requested or demanded; or (b) will reimburse such contractor, grantee, or other recipient for any portion of the money or property which is requested or demanded . . . ." 31 U.S.C. § 3729(b)(2)(A)(i)-(ii).

16.     "[T]he term 'material' means having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4).

17.     Private citizens, such as Eborall, are allowed to bring actions on the government's behalf. "(1) A person may bring a civil action for a violation of section 3729 for the person and for the United States Government. The action shall be brought in the name of the Government." 31 U.S.C.A. § 3730(b)(1).

Page 4 - COMPLAINT                          53518-75290 *2430986_1\RMH 10/27 2016*

18.     Under 31 U.S.C.A. § 3730 (e), there has been no statutory relevant public disclosure of the allegation or transactions in this Complaint with respect to which Plaintiff-Relator Eborall is not an "original source," and all material information relevant to this Complaint was provided to the United States Government prior to filing her Complaint pursuant to 31 U.S.C.A. § 3730(e)(4)(B).

19.     As will be described below, the Defendants submitted false and/or fraudulent claims for payment to Medicare, TRICARE, and other government healthcare programs.

## MEDICARE

20.     The Medicare program was enacted in 1965 and the Secretary of Health and Human Services regulates the administration of the program through the Centers for Medicare and Medicaid Services ("CMS"). See 42 C.F.R. 422.503(a). It is codified at Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*

21.     Medicare is the federal health insurance program for people who are 65 or older, certain younger people with disabilities, and people with End-Stage Renal Disease. *What's Medicare*, CMS, last visited September 13, 2016, https://www.medicare.gov/sign-up-change-plans/decide-how-to-get-medicare/whats-medicare/what-is-medicare.html

22.     Medicare is made up of four component Parts: Part A, Part B, Part C, and Part D.

23.     Medicare Part A provides hospital and facility coverage, Part B provides medical insurance, Part C allows private insurers to provide Medicare benefits that include Original Medicare benefits under Parts A and B and additional coverages as well, and Part D provides prescription drug coverage. Parts A and B are known as Original Medicare and are fully administered by the federal government. Under Part C, Medicare pays a HMO a monthly, flat fee for each of its enrolled beneficiaries. The monthly fees provide reimbursement for the services provided.

Page 5 - COMPLAINT

53518-75290 2430986_1\RMH 10/27 2016

24.     Medicare consists of both Fee-For-Service and managed care services. Fee-for-service ("FFS") claims are submitted to a Medicare Administrative Contractor (MAC). CMS relies on a network of MACs to serve as the primary operational contact between the Medicare FFS program and the health care providers enrolled in the program. MACs are multi-state, regional contractors responsible for administering both Medicare Part A and Medicare Part B claims. *What Is A MAC*, CMS, last updated February 5, 2016, https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC.html

25.     Collectively, the MACs process more than 1.2 billion Medicare FFS claims annually, of which 210 million are Part A claims and more than 1 billion are Part B claims, for a total of $367 billion in Medicare benefits. *What Is A MAC*, CMS, last updated February 5, 2016, https://www.cms.gov/Medicare/Medicare-Contracting/Medicare-Administrative-Contractors/What-is-a-MAC.html

26.     Part C subsidizes Medicare beneficiaries' enrollment in an HMO. Part C is subject to the False Claims Act because government funds are used to advance a federal program or interest and these expenses inflate the HMO's costs, which leads to increased monthly payments. 31 U.S.C.A. § 3729(b)(2).

27.     Medicare only pays providers for services that are medically necessary and that are reasonable. 42 U.S.C.A. § 1395y(a)(1)(A).

28.     When submitting claims to Medicare, all providers must certify that the claims are truthful, accurate, and medically necessary.

29.     To participate in the Medicare Program, providers enter into provider agreements with the Secretary of the Health and Human Services. The provider agreement requires the provider to agree to conform to all applicable statutory and regulatory requirements for reimbursement from Medicare, including the provisions of Section 1862 of the Social Security

Act and Title 42 of the Code of Federal Regulations. As part of that agreement, the provider
must sign the following certification:

> I agree to abide by the Medicare laws, regulations and
> program instructions that apply to [me]. The Medicare
> laws, regulations, and program instructions are available
> through the [Medicare] contractor. I understand that
> payment of a claim by Medicare is conditioned upon the
> claim and the underlying transaction complying with
> such laws, regulations, and program instructions
> (including, but not limited to, the Federal anti-kickback
> statute and the Stark law), and on the [provider's]
> compliance with all applicable conditions of participation
> in Medicare.

Form CMS-855A; Form CMS-8551.

30.     Among the legal obligations of participating providers is the requirement not to
make false statements or misrepresentations of material facts concerning payment requests. *See*
42 U.S.C. § 1320a-7b(a)(1)-(2); 42 C.F.R. §§ 1320a-7b(a)(1)-(2), 413.24(f)(4)(iv).

31.     Medicare professional claims are submitted on Form HCFA-1500 and ASC X12N
837P. As part of the form, Providers must certify to the accuracy and truthfulness of the claims
submitted. The Form also provides that "NOTICE: Any person who knowingly files a statement
of claim containing any misrepresentation or any false, incomplete or misleading information
may be guilty of a criminal act punishable under law and may be subject to civil penalties." The
Medicare Provider's Certification provides:

> I certify that the services shown on this form were
> medically indicated and necessary for the health of the
> patient and were personally furnished by me or were
> furnished incident to my professional service by my
> employee under my immediate personal supervision,
> except as otherwise expressly permitted by Medicare or
> CHAMPUS regulations.

Page 7 - COMPLAINT                    53518-75290 2430986_1:RMH 10/27 2016

> For services to be considered as "incident" to a
> physician's professional service, 1) they must be
> rendered under the physician's immediate personal
> supervision by his/her employee, 2) they must be an
> integral, although incidental part of a covered physician's
> service, 3) they must be of kinds commonly furnished in
> physician's offices, and 4) the services of nonphysicians
> must be included on the physician's bills.

*See* Health Insurance Claim Form HCFA-1500. A copy of Form HCFA-1500 is attached hereto
as Exhibit A.

32. Therefore, all Medicare providers certify that the services they bill for are
accurate, truthful, were actually provided, and were medically necessary.

33. Hospitals submit claims on Form CMS-1450 and ASC X12N 837I, which are also
known as Form UB-04. Each claim submission made by a hospital certifies that the billing
information is accurate, true and complete. The form further certifies that the "Physician's
certifications and re-certifications, if required by contract or Federal regulations, are eon file."
The form is used for both Medicare and TRICARE claims. A copy of CMS Form 1450/UB-04 is
attached hereto as Exhibit B.

## TRICARE

34. TRICARE is the health program for uniformed service members and their
families provided by the United States Department of Defense. It is managed by the Defense
Health Agency ("DHA"). TRICARE, *About Us*, http://www.tricare.mil/About (last updated: July
19, 2016.)

35. TRICARE provides comprehensive coverage to all beneficiaries, including
necessary mental health care. TRICARE covers acute inpatient psychiatric care. TRICARE,
*Acute Inpatient Psychiatric Care*,
http://www.tricare.mil/CoveredServices/IsItCovered/Prescriptions (last updated: June 23, 2016.)

Page 8 - COMPLAINT                    53518-75290 2430986_1\RMH 10/27 2016

36.     Medicare and TRICARE are considered federal health care programs and only pay for services that are reasonable and medically necessary.

## MEDICARE REGULATIONS FOR INPATIENT PSYCHIATRIC FACILITIES

37.     Chapter Two of the Medicare Benefit Policy Manual outlines many of the rules and guidelines that inpatient psychiatric facilities must follow to participate in the Prospective Payment System (PPS). The regulations are also codified at 42 CFR 412. A copy of Chapter 2 is attached hereto as Exhibit C.

38.     Cedar Hills is an inpatient psychiatric facility (IPF).

39.     "The term "inpatient psychiatric facility services" means inpatient hospital services furnished to a patient of an inpatient psychiatric facility. IPFs are certified under Medicare as inpatient psychiatric hospitals and distinct psychiatric units of acute care hospitals and CAHs." CMS, *Medicare Benefit Policy Manual*, (Publication 100-02), Chapter 2 at 10.1, http://www.cms.gov/Regulations-and-Guidance/ Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS012673.html; Exhibit C.

40.     IPFs are certified under Medicare as inpatient psychiatric hospitals, which means, "an institution that is primarily engaged in providing, by or under the supervision of a physician, psychiatric services for the diagnosis and treatment of mentally ill patients, maintains clinical records necessary to determine the degree and intensity of the treatment provided to the mentally ill patient, and meets staffing requirements sufficient to carry out active programs of treatment for individuals who are furnished care in the institution." Exhibit C at 10.3, pp. 2-3.

41.     A provisional or admitting diagnosis is required for all patients at IPFs. "For all IPFs, a provisional or admitting diagnosis must be made on every patient at the time of admission, and must include the diagnosis of comorbid diseases as well as the psychiatric diagnosis. In addition, according to 42 CFR 412.27(a) and 42 CFR 482.61, distinct part psychiatric units of acute care hospitals and CAHs are required to admit only those patients

Page 9 - COMPLAINT                                          53518-75290 2430986_1\RMH 10/27 2016

whose admission to the unit is required for active treatment, of an intensity that can be provided

appropriately only in an inpatient hospital setting, of a psychiatric principal diagnosis that is

listed in the Fourth Edition, Text Revision of the American Psychiatric Association's Diagnostic

and Statistical Manual, or in Chapter Five of the International Classification of Diseases

applicable to the service date. Psychiatric hospitals are required to be primarily engaged in

providing, by or under the supervision of a psychiatrist, psychiatric services for the diagnosis and

treatment of mentally ill persons, according to 42 CFR 412.23(a)." Exhibit C at 20, pp. 3-4.

42.     Medicare requires that the physician must certify "at the time of admission as

soon thereafter as is reasonable and practicable that the patient needs, on a daily basis, active

inpatient treatment furnished directly by or requiring the supervision of IPF [Inpatient

Psychiatric Facility] personnel." Department of Health and Human Services: CMS, *Inpatient

Psychiatric Facility Prospective Payment System*, October 2014, p. 2,

https://www.cms.gov/Outreach-and-Education/Medicare-Learning-Network-

MLN/MLNProducts/downloads/InpatientPsychFac.pdf.

43.     The certification that a physician must provide, with respect to IPF services, is

"documentation that the services furnished can reasonably be expected to improve the patient's

condition or for diagnostic study. The certification is required at the time of admission or as soon

thereafter that is reasonable and practicable." Exhibit C at 30.2.1.2, p. 5.

44.     If the patient continues to "require active inpatient psychiatric treatment, then a

physician must recertify as of the 12th day of hospitalization . . . that the services were and

continue to be required for treatment that could reasonably be expected to improve the patient's

condition, or for diagnostic study, and that the patient continues to need, on a daily basis, active

treatment furnished directly by or requiring the supervision of inpatient psychiatric facility

personnel. In addition, the hospital records should show that services furnished were intensive

treatment services, admission or related services, or equivalent services." Exhibit C at 30.2.1.2,

Page 10 - COMPLAINT                                  53518-75290 *2430986_1\RMH 10/27 2016*

pp. 5-6.

45.     Active treatment was and is required in order to receive payment. "Payment for IPF services is to be made only for "active treatment" that can reasonably be expected to improve the patient's condition. To assure that payment is made only under such circumstances, the law includes certain requirements that must be met before the services furnished in an IPF can be covered, including medical necessity and certification." Exhibit C at 30.2.2, pp. 6-7.

46.     For services in an IPF to be designated as active treatment, they must be:

- Provided under an individualized treatment or diagnostic plan;

- Reasonably expected to improve the patient's condition or for the purpose of diagnosis; and

- Supervised and evaluated by a physician.

Exhibit C at 30.2.2.1, p. 7; 42 CFR 482.61. The fact that a patient is under the supervision of a physician does not necessarily mean the patient is getting active treatment.

47.     Physician participation in the services is an essential ingredient of active treatment. "The services of qualified individuals other than physicians, e.g., social workers, occupational therapists, group therapists, attendants, etc., must be prescribed and directed by a physician to meet the specific psychiatric needs of the individual. In short, the physician must serve as a source of information and guidance for all members of the therapeutic team who work directly with the patient in various roles. It is the responsibility of the physician to periodically evaluate the therapeutic program and determine the extent to which treatment goals are being realized and whether changes in direction or emphasis are needed. Such evaluation should be made on the basis of periodic consultations and conferences with therapists, reviews of the patient's medical record, and regularly scheduled patient interviews, at least once per week." Exhibit C at 30.2.3, p. 8.

53518-75290 2430986_1\RMH/10/27/2016

48.     The individual patient must have an individual and comprehensive treatment plan. Exhibit C at 30.3.1, p. 9. "The services must be provided in accordance with an individualized program of treatment or diagnosis developed by a physician in conjunction with staff members of appropriate other disciplines on the basis of a thorough evaluation of the patient's restorative needs and potentialities. The plan of treatment must be recorded in the patient's medical record in accordance with 42 CFR 482.61, Conditions of Participation for Hospitals." Exhibit C at 30.3., p. 9.

49.     The individual treatment plan must be written and include five different elements:

(1) A substantiated diagnosis;

(2) Short-term and long-range goals;

(3) The specific treatment modalities utilized;

(4) The responsibilities of each member of the treatment team; and

(5) Adequate documentation to justify the diagnosis and the treatment and rehabilitation activities carried out.

Exhibit C at 30.3.1, p. 9.

50.     The medical records "maintained by an IPF must permit determination of the degree and intensity of the treatment provided to individuals who are furnished services in the institution, according to 42 CFR 412.27 and 42 CFR 482.61. In addition, consistent with sound clinical practice, all medical records, including progress notes and treatment plan, should be legible and complete, and should be promptly signed and dated by the person (identified by name and discipline) who is responsible for ordering, providing or evaluating the service furnished." Exhibit C at 30, p. 4.

51.     Payments to IPFs such as Cedar Hills are made on a per diem basis. "Payments to IPFs under the IPF PPS are based on a single Federal per diem base rate computed from both the inpatient operating and capital-related costs of IPFs (including routine and ancillary services),

Page 12 - COMPLAINT                    53518-75290 2430986_1\RMH/10/27 2016

but not certain pass-through costs (i.e., bad debts, direct graduate medical education, and nursing and allied health education)." CMS, Medicare Claims Processing Manual (Publication 100-04), Chapter 3 at 190.4, http://www.cms.gov/Regulations-and-Guidance/ Guidance/Manuals/Downloads/clm104c03.pdf. A copy of the relevant portions of Chapter 3 are attached hereto as Exhibit D.

52.     IPFs generally submit one claim per IPF patient and that claim is submitted after discharge. "When the patient has Medicare benefits, IPF providers will submit one admit through discharge claim for the stay upon discharge.' Exhibit D at 190.10.2.

53.     IPFs are also allowed additional reimbursement amounts if they train interns and residents. Exhibit D at 190.6.3, p. 18.

54.     Although Medicare provides coverage for psychiatric hospital inpatient stays, coverage is limited to 190 days. Exhibit C at 80, p. 12; 42 CFR 409.62.

55.     The per diem payment is adjusted based upon the number of days the patient is admitted to the hospital. "The variable per diem adjustments account for the ancillary and certain administrative costs that occur disproportionately in the first days after admission to an IPF. The variable per diem adjustments decline each day of the patient's stay through day 21. After day 21, the adjustments remain the same each day for the remainder of the stay." Exhibit D at 190.5.5, pp. 16-17.

56.     Medicare pays the full amount of the first 60 days of an inpatient hospitalization during each benefit period. Following the 60th day of inpatient care, the Medicare covered individual has a co-insurance payment. Once a covered individual is discharged and does not receive inpatient care for 60 days in a row, a new benefit period begins. CMS, Your Medicare Coverage, https://www.medicare.gov/coverage/hospital-care-inpatient.html (last visited: October 19, 2016.)

57.     When submitting claims to Medicare, Cedar Hills and UHS are required to use

Page 13 - COMPLAINT                                    53518-75290 2430986_1\RMH 10/27 2016

HCPCS CPT Codes. In the inpatient setting, the initial CPT codes at time of admission are 99221, 99222, and 99223. 99223 is for the highest level of care and reimburses at the highest rate. Although the codes are untimed, physicians generally spend 30, 50, and 70 minutes of care respectively. The three codes are described as:

**99221—The three following components are required:**

 • Detailed or comprehensive history
 • Detailed or comprehensive examination
 • Medical decision making that is straightforward or of low complexity
Presenting problem(s): Low severity
Typical time: 30 minutes at the bedside or on the patient's floor or unit

**99222—The three following components are required:**

 • Comprehensive history
 • Comprehensive examination
 • Medical decision making of moderate complexity
Presenting problem(s): Moderate severity
Typical time: 50 minutes at the bedside or on the patient's floor or unit

**99223—The three following components are required:**

 • Comprehensive history
 • Comprehensive examination
 • Medical decision making of high complexity
Presenting problem(s): High severity
Typical time: 70 minutes at the bedside or on the patient's floor or unit

Procedure Coding Handbook for Psychiatrists, Fourth Edition, p. 45.

58.    Cedar Hills routinely admitted patients using CPT 99223 regardless of the patient's actual condition and the treatment that was actually provided.

59.    Subsequent hospital care during the inpatient hospitalization is coded as 99231, 99232, and 99233. 99233 is for the highest level of care and reimburses at the highest rate.

53518-75290 2430986_1 RMH 10/27/2016

Although the codes are untimed, physicians generally spend 15, 25, and 35 minutes of care respectively. The three codes are described as follows:

**99231—Two of the three following components are required:**

- Problem-focused interval history
- Problem-focused examination
- Medical decision making that is straightforward or of low complexity

Presenting problem(s): Patient usually stable, recovering, or improving

Typical time: 15 minutes at the bedside or on the patient's floor or unit

**99232—Two of the three following components are required:**

- Expanded problem-focused interval history
- Expanded problem-focused examination
- Medical decision making of moderate complexity

Presenting problem(s): Patient responding inadequately to therapy or has developed a minor complication

Typical time: 25 minutes at the bedside or on the patient's floor or unit

**99233—Two of the three following components are required:**

- Detailed interval history
- Detailed examination
- Medical decision making of high complexity

Presenting problem(s): Patient unstable or has developed a significant new Problem

Typical time: 35 minutes at the bedside or on the patient's floor or unit

Id., at p. 50.

60.     Cedar Hills routinely submitted claims using CPT 99233 regardless of the patient's actual condition and the services that were rendered.

61.     These are both per diem services. "Both Initial Hospital Care (CPT codes 99221 - 99223) and Subsequent Hospital Care codes are "per diem" services and may be reported only once per day by the same physician or physicians of the same specialty from the same group practice." CMS, Medicare Claims Processing Manual, Chapter 12: Physicians/Nonphysician

Page 15 - COMPLAINT                                    53518-75290 *2430986_1\RMH 10/27 2016*

Practitioners, p. 55, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Downloads/clm104c12.pdf.

62.    Psychotherapy add-on codes were also billed in addition to 99233. These codes, commonly 90832, 90834, and 90837, are timed codes. Medicare requires that the physician providing the services actually treat the patient for the corresponding amount of time. For example, these three codes, respectively, require treatment for 30, 45, and 60 or more minutes. Relator is aware that physicians failed to spend the required time with patients yet claims were submitted as if the treatment time was provided.

## **FACTUAL BACKGROUND**

63.    Relator began her employment with Cedar Hills in approximately March 2011 as a mental health technician. In March 2012, she transitioned into the utilization review department for Cedar Hills. She worked in the utilization review department for approximately three years.

64.    As part of her job duties, Relator was a liaison between Cedar Hill's Administration, physicians, and insurance companies. She contacted external case managers/managed care organizations for certification and recertification of insurance benefits throughout the patient's stay, assuring tracking of the insurance reviews, and completed reviews in a timely manner.

65.    Relator provided feedback to the treatment team in attempts to help them understand an insurance company's requirements for continued stay and discharge planning. She was responsible for having an understanding of the patient's treatment through communication with the treatment team and maintained ongoing contact with the attending physician, program manager, nurse manager, and various members of the team.

66.    Cedar Hills tracked patient admissions and hospitalization on its "Midas" system. The Midas system is the computer program/system used by UHS to track all patient admissions,

Page 16 - COMPLAINT                                                 53518-75290 2430986_1\RMH 10/27 2016

payers, discharges, lengths of stay, denials, certified and uncertified days, doctor assignments, etc. UHS runs all reports from the data in the Midas system and uses those reports in its required daily, morning meetings.

67.     At the meetings, reports are reviewed listing all patients in the hospital, all new admissions, all discharges for the day, and all certified and uncertified days. These are reviewed in detail by the CEO, CFO, Business Office Manager, the Nursing Supervisor, and UR staff. If there are any patients that are denied insurance coverage or have run out of Medicare certified or benefit days, the CEO and CFO will push everyone for a discharge that same day. The CEO sends text messages to the doctors assigned to any patients that have had insurance benefits denied or that are out of Medicare benefits and lets the doctor know about the denial. If a denied patient remains in the hospital and is not discharged, the UR staff is harassed about it in every morning meeting, until the patient is discharged. If there are too many discharges planned for the day and not enough new admissions to fill those beds, again we were harassed and everyone is supposed to find patients either willing to stay longer if they have Medicare or have the doctor figure out a way to give more clinical for more days to be authorized by the insurance company.

68.     UHS and Cedar Hills had a system in place that monitored Medicare covered individuals' amount of days remaining for each benefit period. As soon at the patient got to 60 days of hospitalization per benefit period, they would discharge the patient as the reimbursement would be less because of the co-insurance requirement.

69.     Cedar Hills' management repeatedly told Relator that Medicare patients were the most important patients to Cedar Hills due to the amount of reimbursement Cedar Hills received from Medicare for the admitted patients. Relator believes that on average, approximately 50-75% of all Cedar Hills' patients were Medicare beneficiaries and Relator is unaware of any time where a majority of the admitted patients were covered by private insurance.

53518-75290 2430986_1\RMH 10/27 2016

70.     Relator noticed that when a person covered by private insurance would present to Cedar Hills for treatment, Cedar Hills would inquire with the insurance company if the company would pay for and authorize the services. If the insurance company would not authorize payment for the services, Cedar Hills would deny admission to the person.

71.     Privately insured persons required prior authorizations prior to being admitted. If an authorization was obtained, the patient would be admitted, assuming there was a bed available.

72.     Cedar Hills tracked private insurance company's payment data and kept their patients admitted so long as they thought the insurance company would pay. Cedar Hills would discharge the patient when the company would no longer pay, even if the patient should not have been discharged.

73.     When a private insurance covered patient's authorization was expiring, some physicians would increase a medication dosage or change a medication in an effort to obtain additional authorized days from private insurance companies. Cedar Hills had a pharmacy on site. The medication would have to be significant enough to warrant 24 hour monitoring in the hospital setting. Additionally, some physicians would also say they were having a meeting with the patient's family in order to get additional days authorized. Many of these so called meetings never took place.

### A. Medicare Beneficiaries Were Automatically Admitted into Cedar Hills Hospital Regardless of Medical Necessity

74.     Generally, Medicare beneficiaries do not require a prior authorization to seek treatment for behavioral health services. This was also true for Medicare covered individuals who sought treatment at Cedar Hills. As such, all Medicare covered individuals that presented to Cedar Hills were admitted to the hospital.

Page 18 - COMPLAINT                                    53518-75290 2430986_1\RMH/10/27/2016

75.      Upon information and belief, all TRICARE covered individuals that presented to Cedar Hills were admitted to the hospital. They were admitted under the highest level of care, CPT 99223 regardless of their actual condition.

76.      Cedar Hills and UHS had an established system whereby all Medicare and TRICARE would be admitted and then would be certified and re-certified for lengthy hospitalizations regardless of the medical necessity of the treatment and/or hospitalization.

77.      Relator is unaware of any instances where a Medicare or TRICARE covered individual was denied admission to Cedar Hills.

**B.   Cedar Hills's Medicare Certification and Re-Certification Process Is a Sham**

78.      Medicare reimburses facilities such as Cedar Hills on federal per diem rates. 42 CFR 412. Relator is aware that Medicare was paying approximately $800 per day per patient to Cedar Hills and UHS for Medicare covered individuals that were hospitalized at Cedar Hills. Therefore, the longer a hospitalization lasted, the more money Cedar Hills received.

79.      Medicare does not pay for an individual's hospitalization unless a physician has certified the need for such hospitalization.

80.      Cedar Hills sought to increase the length of Medicare covered individuals' hospitalizations in an effort to increase the amount of Medicare payments to it.

81.      When a Medicare beneficiary presents to Cedar Hills, in order for Medicare to pay for a hospitalization, a physician must certify the necessity of such hospitalization following a psychiatric evaluation. However, the hospitalization decision was frequently made even before the physician saw the patient and performed a psychiatric evaluation.

82.      Cedar Hills' employees and/or administration often times filled out this certification form for the physicians and the physicians merely signed their names to the form. Frequently, these certifications ordering hospitalizations were filled out by non-physicians before the physician ever saw the patient. Thus, the physician's signature was a sort of "rubber stamp"

Page 19 - COMPLAINT                                        53518-75290 2430986_1\RMH 10/27/2016

to make it appear as though Cedar Hills was complying with Medicare requirements and that the patient actually required hospitalization. The certifications were therefore false and fraudulent.

83.     Additionally, Relator is aware if the Medicare Certification was missed for any reason, the physicians would backdate their signatures so all days would be paid for, even though a certification was not executed.

84.     Upon being admitted to Cedar Hills and after the physician certified that the hospitalization was necessary, Medicare would pay for up to 12 days of treatment for the patient. *See* Exhibit C at 30.2, p. 5.

85.     On day two or three of the Medicare patients' hospitalization, during the first treatment team after their admission, the doctor would project the discharge date to be 20 to 28 days out because they did not need a Medicare prior authorization.

86.     Following the first certification and initial 12 days' hospitalization, a re-certification would be performed to make it appear that the patient needed continued hospitalization. This re-certification is required by Medicare.

87.     The re-certification was valid for 18 days. Once the re-certification was done, Medicare would potentially pay for up to 30 days of its covered individual's hospitalization, even though the patient may not have needed any hospitalization at all.

88.     Relator was told that hospitalizations longer than 30 days would potentially be a "red flag" to Medicare and therefore, Medicare beneficiaries were frequently discharged after approximately 21 days of acute level of care treatment.

89.     The average hospitalization for a Cedar Hills' Medicare covered patient was approximately 21 days whereas a patient covered by private insurance was oftentimes only hospitalized for 3-5 days.

90.     Upon information and belief, all Medicare covered patients at Cedar Hills were always re-certified to extend their hospitalization beyond the initial 12 days so long as the patient

was willing to stay at the facility.

91.     Similar to how the initial certification was executed, Cedar Hills' employees, who were not physicians, filled out the re-certifications and the physicians were simply signing off on the certification to make it appear as though the patient needed continued hospitalization.

92.     Physicians rarely evaluated the patients in order to properly certify and re-certify the continued hospitalization.

93.     The physicians met their patients each day but oftentimes, the daily meetings were for approximately 10-15 minutes. However, the treatment was supposed to be longer than this, as is evidenced by the CPT codes. Relator also was told that the treatment was supposed to be longer than actually provided by a Cedar Hills physician.

94.     A different physician would stop his patient in the hallways and converse with the patient for mere minutes. The physician would use this interaction as the day's required patient meeting. Relator is aware that on many occasions, this physician's patient would ask staff members for their daily meeting only to be told that the physician had already met with them and counted their hallway conversations as their daily meeting.

95.     Due to the low interaction between physician and patient, Cedar Hills physicians relied on hospital staff for a majority of their patients' treatment updates and needs. Therapists and social workers filled out the treatment plans and would forward the proposed plans to the physicians during treatment team meetings. Oftentimes, the treatment plans were not reviewed by the physician prior to the physician signing the plan. This is because the treatment plans were all similar to one another, regardless of patient needs. The forms were essentially fill in the blank forms that the staff filled out.

96.     Therefore, much of the treatment that is described in the medical records was not provided. If it was, the physician had little to no involvement in the treatment and the plans were not individualized, as Medicare requires.

Page 21 - COMPLAINT                                        53518-75290 2430986_1\RMH/10/27/2016

97.     The physicians routinely had 18-22 patients to treat each day, in addition to other tasks. However, a normal workday was only 6-7 hours.

## C. UHS's and Cedar Hills's Use of "Clinical Documentation Improvement Specialists"

98.     Medicare and TRICARE pay for medically necessary services. In order to demonstrate the necessity of services, government health programs require certain documentation in order to determine if a payment should be made to the provider.

99.     Cedar Hills' practice of lengthening Medicare patients' hospitalizations needed to be supported by medical records to ensure that Medicare would pay for the continued hospitalization.

100.    Each patient file includes a tracking sheet in the front of the medical billing section. Cedar Hills physicians are required to fill in the level of service provided each day for each patient. These forms are routinely backdated. Relator is aware that the CPT codes that were used were never in fact properly billed. The codes require a certain amount of time to be spent treating the patient but Cedar Hills physicians did not spend the required time with patients.

101.    In order to make it appear as though the services were medically necessary, UHS employed people known as "Medicare Auditors" and/or "Clinical Documentation Improvement Specialists."

102.    Upon information and belief, UHS employs Medicare Auditors and/or Clinical Documentation Improvement Specialists at each of its facilities.

103.    The Medicare Auditors or Clinical Documentation Improvement Specialists review all of the facility or provider's Medicare charts on a daily basis and verify that there is adequate documentation to support a continued inpatient hospitalization.

104.    The auditors also make sure the certification and re-certification forms have been signed by the attending physician within the time frame Medicare requires for payment. If the

Page 22 - COMPLAINT                                    53518-75290 2430986_1\RMH/10/27/2016

certifications are not signed, the auditor has the physician sign and backdate the form to the date that is needed so that Medicare will pay for the duration of the hospitalization. Relator is aware that some forms would be backdated for multiple days.

105.    The auditors would also evaluate the physicians based upon whether the physicians had included certain terminology in their medical records, notes, etc. that would support a continuing inpatient hospitalization and that would further support a continued stay at a high level of needed care.

106.    After UHS took ownership of Cedar Hills, the hospital overhauled its Medicare documentation expectations and process. The documents were revised such that all of its documentation standards were matched to the Medicare standards as opposed to having private insurance paperwork in addition to Medicare paperwork. This was done to ensure that no Medicare patient ever missed any of the require Medicare paperwork.

107.    UHS would continually conduct audits to ensure that the medical records supported an acute level of hospitalization. The audits were not conducted to verify accuracy of reports but rather, were solely conducted to train and critique staff so that that staff knew how to document records to support acute hospitalizations.

108.    Cedar Hills staff are required to make the documentation meet the Medicare criteria for acute hospitalization regardless of the patient's actual needs. Cedar Hills and UHS were not worried about an actual Medicare audit because the paperwork that they mandated ensured that the hospitalizations would be supported in the records. However, the paperwork was deceptive and false.

109.    After UHS acquired Cedar Hills, UHS instructed physicians and other employees on what should be included in all medical records, reports, psychiatric evaluations, progress notes, etc., including the hospitalization certifications. Similarly, UHS also instructed its physicians and staff members exclude certain terms in medical records that may make it appear

Page 23 - COMPLAINT                                          53518-75290 2430986_1 RMH 10/27/2016

as though a continued hospitalization was not necessary. For example, UHS instructed its employees to not use the words "stable," "bright," and "no detox symptoms," in addition to other terms and phrases.

110.    When UHS purchased Ascend, including Cedar Hills, it sent its employees to Cedar Hills to demonstrate how it wanted Medicare claims forms and records filled out. This was done even though Cedar Hills had previously submitted Medicare claims for approximately four years. The employees sent by UHS were a specific team of UHS employees that flew to various UHS facilities in order to train the staff on how to fill out Medicare documentation. After interacting with this team, Relator learned UHS was teaching its employees to deceive Medicare.

111.    One member of this team sat in a conference room going through Medicare charts to critique Cedar Hills' employees and show where the documents could be strengthened to make it appear as though the services provided were medically necessary. She then gave the Cedar Hills employee an action plan on how to improve all Medicare charts to prevent Medicare from taking back payments.

### D. UHS and Cedar Hills's Physician Compensation Plan Encouraged Physicians to Certify Longer Hospitalizations for Medicare Patients

112.    Physicians employed at Cedar Hills' were compensated, in part, upon the number of patients that they visited and treated each day. Thus, Cedar Hill's encouraged and developed a culture where physicians were encouraged to keep patients admitted to Cedar Hills for longer durations than may have been necessary in an effort to increase their own pay.

113.    Cedar Hills physicians were paid $100 per day per patient they visited with.

114.    Frequently, Cedar Hills physicians would only spend 10-15 minutes per day with each patient.

115.    Cedar Hills employees were aware that physicians wanted to keep Medicare patients admitted into the hospital for as long as possible. Physicians asked social workers to

Page 24 - COMPLAINT                    53518-75290 2430986_1\RMH/10/27/2016

help them by making patients comfortable to ensure the patient would not want to discharge early.

116.    On numerous occasions, Relator heard physicians state that the physicians wanted more Medicare patients as they were easy to treat than private insurance patients. I heard them often say the Medicare longer stays gave everyone a break from the fast pace of acute care. This was because when new patients would be admitted, comprehensive evaluations would be required versus established patients who only visited with the physicians for a few minutes each day.

### E. Cedar Hills Admitted Blacklisted Patients When its Facility Had Open Beds to Increase its Medicare and TRICARE Reimbursement

117.    Patients frequently returned to Cedar Hills after having been treated at the hospital previously. Recently, Cedar Hills has sought to limit this practice as Medicare has made it more difficult to be reimbursed for re-admitted patients.

118.    Cedar Hills kept a list of patients that were prohibited from seeking treatment at Cedar Hills based upon previous misconduct while at the hospital. These patients were "blacklisted" after having previously acted out in various ways that deemed them to be unsafe to staff or too much of a nuisance by interfering with other patients' treatment. One particular patient had Borderline Personality Disorder and was a "frequent flyer" and she acted out by cutting her wrist because it was time for her to discharge (it had been around 29 days). She was blacklisted but ended up being admitted again when the hospital had low census.

119.    Cedar Hills' policy was to always have the hospital filled to capacity and would allow these so-called blacklisted patients, assuming the individual was covered by Medicare, to be admitted into the facility if there were any beds available without regard to their blacklisted status.

Page 25 - COMPLAINT                                    53518-75290 2430986_1\RMH/10/27/2016

120.     Relator is aware of an instance where a privately insured patient also had Medicare coverage. The patient had Medicare and private insurance. Cedar Hills submitted the hospitalization claim under Medicare as the primary insurer. The private insurance still required every other day reviews and stopped authorizing for payment after approximately 7 days. However, Cedar Hills continued the hospitalization for approximately 25 days on the belief that the patient had Medicare as its primary insurance and Medicare would pay the bill. Cedar Hills then found out the private insurance really was the actual primary insurer and that over 20 days would not be paid for. The private insurance would not pay for any more than the 7 days because the patient did not meet inpatient hospitalization criteria. Cedar Hills discharged the patient the day it found out he did not have Medicare as his primary insurance and the doctor told Relator he would have discharged him two weeks earlier if he knew Medicare was not going to cover it.

121.     Cedar Hill's CEO was Elizabeth Hutter and its CFO was John Prehm. The previous CEO was Mike Sherbun. Mr. Sherbun told Relator and other Cedar Hills employees that his wages relied upon keeping the hospital fully occupied.

122.     UHS required Cedar Hills to submit monthly and quarterly reports to UHS. Based upon Cedar Hills' performance, the CEO and CFO would receive bonuses from UHS.

## CLAIMS FOR RELIEF

**COUNT I.      Violations of the False Claims Act - 31 U.S.C. § 3729(a)(1)(A)**

123.     Relator incorporates by reference each of the preceding paragraphs of this Complaint.

124.     This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729 et seq., as amended.

125.     By virtue of the acts described above, the Defendants knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, which resulted in countless millions of dollars of payments of false claims by the United States Government to the

Page 26 - COMPLAINT                                                 53518-75290 *2430986_1\RMH/10/27/2016*

Defendants. All such false claims and acts are in violation of the FCA in general and specifically in violation of 31 U.S.C. § 3729(a)(1)(A).

126.    The acts described above induced the United States Government to pay or approve such false or fraudulent claims.

127.    In reliance on these false representations and claims, the United States Government, by and through its intermediaries, agents, and agencies, paid countless millions of dollars for services the Defendants contracted to provide that it otherwise would not have paid had the government been aware of Defendants' knowing violations of the FCA and the various rules and regulations of the Medicare, TRICARE, and other government funded medical programs.

128.    By reason of Defendants' acts, the United States has been damaged and continues to be damaged in substantial amounts to be determined at trial.

129.    Pursuant to the FCA, the Defendants are liable to the United States for treble damages and a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein submitted prior to August 1, 2016 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after August 1, 2016.

**COUNT II.       Violations of the False Claims Act - 31 U.S.C. § 3729(a)(1)(B)**

130.    Relator incorporates by reference each of the preceding paragraphs of this Complaint.

131.    This is a claim for treble damages and penalties under the FCA, 31 U.S.C. § 3729 et seq., as amended.

132.    By virtue of the acts described above, the Defendants also knowingly made, used or caused to be made or used, false records and statements material to a false or fraudulent claim which resulted in millions of dollars of payments of false claims by the United States

Page 27 - COMPLAINT                          53518-75290 2430986_1\RMH 10/27 2016

Government to the Defendants. All such false claims and acts are in violation of the FCA in general and specifically in violation of 31 U.S.C. § 3729(a)(1)(B).

133.  Every such payment by the United States to the Defendants was a product of a false claim and materially false statements made by Defendants.

134.  In reliance on these false representations and claims, the United States Government, by and through its intermediaries, agents, and agencies, paid countless millions of dollars for services the Defendants contracted to provide that it otherwise would not have paid had the government been aware of Defendants' knowing violations of the FCA and the various rules and regulations of the Medicare, TRICARE, and other government funded medical programs.

135.  By reason of Defendants' acts, the United States has been damaged and continues to be damaged in substantial amounts to be determined at trial.

136.  Pursuant to the FCA, the Defendants are liable to the United States for treble damages and a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein submitted prior to November 2, 2015 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after August 1, 2016.

**COUNT III.    Violations of the False Claims Act - 31 U.S.C. § 3729(a)(1)(C)**

137.  Relator incorporates by reference each of the preceding paragraphs of this Complaint.

138.  The False Claims Act, 31 U.S.C. § 3729(a)(l)(C), imposes liability on any person who conspires to commit a violation of subparagraph (A), (B), (D), (E), (F), or (G).

139.  Defendants have engaged in illegal conspiracy with each other to collect Federal funding for the purposes of profit.

Page 28 - COMPLAINT                                        53518-75290 *2430986_1\RMH/10/27.2016*

140. Defendants knowingly submitted false claims to the United States when Defendants conspired in the billing practices, as described above, for the purposes of obtaining compensation to which they would otherwise not be entitled.

141. With respect to the aforementioned misrepresentations and failures to comply, Defendants knowingly made false claims to officials of the United States for the purpose of obtaining compensation and Defendants received such compensation from the United States as a result of Defendants said false claims.

142. The United States has been damaged by all of the aforementioned fraud and illegal conduct in an as of yet undetermined amount.

143. Pursuant to the FCA, the Defendants are liable to the United States for treble damages and a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein submitted prior to August 1, 2016 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after August 1, 2016.

**COUNT IV.    Violations of the False Claims Act - 31 U.S.C. § 3729(a)(1)(G)**

144. Relator incorporates by reference each of the preceding paragraphs of this Complaint.

145. The False Claims Act, 31 U.S.C. § 3729(a)(l)(G), imposes liability on any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

146. Defendants knowingly made false claims to officials of the United States for the purpose of obtaining compensation and Defendants received such compensation from the Government as a result of Defendants' false claims.

Page 29 - COMPLAINT                                        53518-75290 2430986_1\RMH/10/27 2016

147.     Through the acts described above, by knowingly concealing money that was owed to the Government when, after Defendants knowingly received money through an illegal scheme, Defendants kept the profit they made off the government payments, Defendants knowingly concealed or knowingly and improperly avoided an obligation to pay or transmit money or property to the Government.

148.     The United States has been damaged by all of the above fraud and illegal conduct in an as of yet undetermined amount.

149.     Pursuant to the FCA, the Defendants are liable to the United States for treble damages and a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein submitted prior to August 1, 2016 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after August 1, 2016.

**COUNT V.     Violations of 42 U.S.C. § 1320a-7k**

150.     Relators incorporate by reference each of the preceding paragraphs of this Complaint.

151.     42 U.S.C. 1320a-7k is known as the "MEDICARE AND MEDICAID PROGRAM INTEGRITY PROVISIONS" in the Social Security Act. Section 1128J(d)(1) of the Social Security Act requires a person who has received an overpayment to report and return the overpayment to the Secretary, the state, an intermediary, a carrier, or a contractor, as appropriate, at the correct address, and to notify the Secretary, state, intermediary, carrier or contractor to whom the overpayment was returned in writing of the reason for the overpayment. Section 1128J(d)(2) of the Act requires that an overpayment be reported and "returned by the later of— (A) the date which is 60 days after the date on which the overpayment was identified; or (B) the date any corresponding cost report is due, if applicable." Section 1128J(d)(3) of the Act specifies that "any overpayment retained by a person after the deadline for reporting and returning an

Page 30 - COMPLAINT

overpayment is an obligation (as defined in 31 U.S.C. 3729(b)(3)) . . . for purposes of 31 U.S.C. 3729."

152. Pursuant to 42 U.S.C. 1320a-7k(4)(B) "the term "overpayment" means any funds that a person receives or retains under subchapter XVIII or XIX to which the person, after applicable reconciliation, is not entitled under such subchapter." Defendants have received funds pursuant to subchapter XVIII.

153. The Defendants are each to be considered a "person" under 42 U.S.C. 1320a-7k(d)(4)(C).

154. Pursuant to 42 U.S.C. 1320a-7k, the Defendants' retention of funds received through the fraudulent scheme described above constitute overpayments that it was required to reimburse.

155. The Defendants have not reimbursed the government the funds that it was overpaid with.

156. The Defendants' actions therefore create a liability under the False Claims Act.

157. Pursuant to the FCA, the Defendants are liable to the United States for treble damages and a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein submitted prior to August 1, 2016 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after August 1, 2016.

**COUNT V. Violations of the Anti-Kickback Statute - 42 U.S.C.A. § 1320a-7b**

158. Relator incorporates by reference each of the preceding paragraphs of this Complaint.

159. The Defendants violated the Anti-Kickback Statute by making bonus payments contingent upon the fraudulent billing.

53518-75290 2430986_1 RMH/10/27/2016

160.    The bonus payments are a form of remuneration that the Anti-Kickback Statute prohibits Defendants from accepting.

161.    A violation of the Anti-Kickback Statute creates civil liability, including liability under the False Claims Act.

162.    The Defendants are therefore liable to the United States for treble damages and a civil penalty of not less than $5,500 and not more than $11,000 for each of the false or fraudulent claims herein submitted prior to August 1, 2016 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after August 1, 2016.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, the United States of America through Relator Carrie Eborall, request the Court for entry of judgment against Defendants and the following relief:

A.    That Defendants cease and desist from further violations of the False Claims Act, 31 U.S.C. § 3729 et seq., and the related Medicare, TRICARE and other federally and state funded medical programs;

B.    That the Court enter judgment against the Defendants in an amount equal to three times the amount of damages suffered by the United States because of Defendants' actions, plus a civil penalty of not less than $5,500 and not more than $11,000 for each false claim or certification in violation of the FCA submitted prior to August 1, 2016 and a civil penalty of not less than $10,781 and not more than $21,563 for each false or fraudulent claim submitted on or after August 1, 2016;

C.    That Relator be awarded the maximum amount allowed pursuant to section 3730(d) of the False Claims Act;

D.    That Relator be awarded all costs of this action, including attorneys' fees, costs and expenses pursuant to 31 U.S.C. § 3730(d); and

53518-75290 2430986_1\RMH 10 27 2016

E. That the United States and Relator be granted such further relief as the court deems equitable, just and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, a jury trial is demanded.

Dated this 27th day of October, 2016.

**JORDAN RAMIS PC**

By: _____

**RUSSELL D. GARRETT,** OSB # 882111
russ.garrett@jordanramis.com
**ROGER A. LENNEBERG,** OSB # 842733
roger.lenneberg@jordanramis.com
Two Centerpointe Dr 6th Flr
Lake Oswego OR 97035
Telephone: (503) 598-7070
    Attorney(s) for Plaintiff Carrie Eborall


**Brian H. Mahany**, WI Bar # 1065623
E-mail: brian@mahanylaw.com
MAHANY LAW
8112 West Bluemound Rd, Ste 101
Wausatosa WI 53213
Telephone: (414) 258-2375
    *Anticipated Pro Hac Vice* Attorneys for
    Plaintiff Carrie Eborall

53518-75290 2430986_1\RMH 10/27 2016

APPROVED OMB-0938-0008

PLEASE
DO NOT
STAPLE
IN THIS
AREA

CARRIER

| | PICA | | **HEALTH INSURANCE CLAIM FORM** | PICA | | |

| 1. MEDICARE | MEDICAID | CHAMPUS | CHAMPVA | GROUP HEALTH PLAN | FECA BLK LUNG | OTHER | 1a. INSURED'S I.D. NUMBER | (FOR PROGRAM IN ITEM 1) |
| (Medicare #) | (Medicaid #) | (Sponsor's SSN) | (VA File #) | (SSN or ID) | (SSN) | (ID) | | |

2. PATIENT'S NAME (Last Name, First Name, Middle Initial)

3. PATIENT'S BIRTH DATE  MM  DD  YY    SEX  M  F

4. INSURED'S NAME (Last Name, First Name, Middle Initial)

5. PATIENT'S ADDRESS (No., Street)

6. PATIENT RELATIONSHIP TO INSURED   Self  Spouse  Child  Other

7. INSURED'S ADDRESS (No., Street)

CITY                                STATE

8. PATIENT STATUS   Single  Married  Other

CITY                                STATE

ZIP CODE          TELEPHONE (Include Area Code)

Employed  Full-Time Student  Part-Time Student

ZIP CODE          TELEPHONE (INCLUDE AREA CODE)

9. OTHER INSURED'S NAME (Last Name, First Name, Middle Initial)

10. IS PATIENT'S CONDITION RELATED TO:

11. INSURED'S POLICY GROUP OR FECA NUMBER

a. OTHER INSURED'S POLICY OR GROUP NUMBER

a. EMPLOYMENT? (CURRENT OR PREVIOUS)  YES  NO

a. INSURED'S DATE OF BIRTH  MM  DD  YY    SEX  M  F

b. OTHER INSURED'S DATE OF BIRTH  MM  DD  YY   SEX  M  F

b. AUTO ACCIDENT?   PLACE (State)  YES  NO

b. EMPLOYER'S NAME OR SCHOOL NAME

c. EMPLOYER'S NAME OR SCHOOL NAME

c. OTHER ACCIDENT?  YES  NO

c. INSURANCE PLAN NAME OR PROGRAM NAME

d. INSURANCE PLAN NAME OR PROGRAM NAME

10d. RESERVED FOR LOCAL USE

d. IS THERE ANOTHER HEALTH BENEFIT PLAN?  YES  NO  If yes, return to and complete item 9 a-d.

READ BACK OF FORM BEFORE COMPLETING & SIGNING THIS FORM.

12. PATIENT'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize the release of any medical or other information necessary to process this claim. I also request payment of government benefits either to myself or to the party who accepts assignment below.

SIGNED _____  DATE _____

13. INSURED'S OR AUTHORIZED PERSON'S SIGNATURE  I authorize payment of medical benefits to the undersigned physician or supplier for services described below.

SIGNED _____

14. DATE OF CURRENT:  MM  DD  YY   ILLNESS (First symptom) OR INJURY (Accident) OR PREGNANCY(LMP)

15. IF PATIENT HAS HAD SAME OR SIMILAR ILLNESS. GIVE FIRST DATE  MM  DD  YY

16. DATES PATIENT UNABLE TO WORK IN CURRENT OCCUPATION  FROM  MM  DD  YY   TO  MM  DD  YY

17. NAME OF REFERRING PHYSICIAN OR OTHER SOURCE

17a. I.D. NUMBER OF REFERRING PHYSICIAN

18. HOSPITALIZATION DATES RELATED TO CURRENT SERVICES  FROM  MM  DD  YY   TO  MM  DD  YY

19. RESERVED FOR LOCAL USE

20. OUTSIDE LAB?  YES  NO    $ CHARGES

21. DIAGNOSIS OR NATURE OF ILLNESS OR INJURY. (RELATE ITEMS 1,2,3 OR 4 TO ITEM 24E BY LINE)

1. _____   3. _____

2. _____   4. _____

22. MEDICAID RESUBMISSION  CODE      ORIGINAL REF. NO.

23. PRIOR AUTHORIZATION NUMBER

| 24. A DATE(S) OF SERVICE | | | | | | B Place of Service | C Type of Service | D PROCEDURES, SERVICES, OR SUPPLIES (Explain Unusual Circumstances) CPT/HCPCS    MODIFIER | E DIAGNOSIS CODE | F $ CHARGES | G DAYS OR UNITS | H EPSDT Family Plan | I EMG | J COB | K RESERVED FOR LOCAL USE |
| From MM | DD | YY | To MM | DD | YY | | | | | | | | | | |
| 1 | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | |

| 25. FEDERAL TAX I.D. NUMBER    SSN  EIN | 26. PATIENT'S ACCOUNT NO. | 27. ACCEPT ASSIGNMENT? (For govt. claims, see back)  YES  NO | 28. TOTAL CHARGE  $ | 29. AMOUNT PAID  $ | 30. BALANCE DUE  $ |

31. SIGNATURE OF PHYSICIAN OR SUPPLIER INCLUDING DEGREES OR CREDENTIALS (I certify that the statements on the reverse apply to this bill and are made a part thereof.)

SIGNED _____  DATE _____

32. NAME AND ADDRESS OF FACILITY WHERE SERVICES WERE RENDERED (If other than home or office)

33. PHYSICIAN'S, SUPPLIER'S BILLING NAME, ADDRESS, ZIP CODE & PHONE #

PIN#          GRP#

PHYSICIAN OR SUPPLIER INFORMATION

PATIENT AND INSURED INFORMATION

(APPROVED BY AMA COUNCIL ON MEDICAL SERVICE 8/88)

FORM HCFA-1500 (12-90), FORM RRB-1500, FORM OWCP-1500

**EXHIBIT A**

EXHIBIT A

Page 1 of 2

**BECAUSE THIS FORM IS USED BY VARIOUS GOVERNMENT AND PRIVATE HEALTH PROGRAMS, SEE SEPARATE INSTRUCTIONS ISSUED BY APPLICABLE PROGRAMS.**

NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties.

### REFERS TO GOVERNMENT PROGRAMS ONLY

MEDICARE AND CHAMPUS PAYMENTS: A patient's signature requests that payment be made and authorizes release of any information necessary to process the claim and certifies that the information provided in Blocks 1 through 12 is true, accurate and complete. In the case of a Medicare claim, the patient's signature authorizes any entity to release to Medicare medical and nonmedical information, including employment status, and whether the person has employer group health insurance, liability, no-fault, worker's compensation or other insurance which is responsible to pay for the services for which the Medicare claim is made. See 42 CFR 411.24(a). If item 9 is completed, the patient's signature authorizes release of the information to the health plan or agency shown. In Medicare assigned or CHAMPUS participation cases, the physician agrees to accept the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary as the full charge, and the patient is responsible only for the deductible, coinsurance and noncovered services. Coinsurance and the deductible are based upon the charge determination of the Medicare carrier or CHAMPUS fiscal intermediary if this is less than the charge submitted. CHAMPUS is not a health insurance program but makes payment for health benefits provided through certain affiliations with the Uniformed Services. Information on the patient's sponsor should be provided in those items captioned in "insured"; i.e., items 1a, 4, 6, 7, 9, and 11.

### BLACK LUNG AND FECA CLAIMS

The provider agrees to accept the amount paid by the Government as payment in full. See Black Lung and FECA instructions regarding required procedure and diagnosis coding systems.

### SIGNATURE OF PHYSICIAN OR SUPPLIER (MEDICARE, CHAMPUS, FECA AND BLACK LUNG)

I certify that the services shown on this form were medically indicated and necessary for the health of the patient and were personally furnished by me or were furnished incident to my professional service by my employee under my immediate personal supervision, except as otherwise expressly permitted by Medicare or CHAMPUS regulations.

For services to be considered as "incident" to a physician's professional service, 1) they must be rendered under the physician's immediate personal supervision by his/her employee, 2) they must be an integral, although incidental part of a covered physician's service, 3) they must be of kinds commonly furnished in physician's offices, and 4) the services of nonphysicians must be included on the physician's bills.

For CHAMPUS claims, I further certify that I (or any employee) who rendered services am not an active duty member of the Uniformed Services or a civilian employee of the United States Government or a contract employee of the United States Government, either civilian or military (refer to 5 USC 5536). For Black-Lung claims, I further certify that the services performed were for a Black Lung-related disorder.

No Part B Medicare benefits may be paid unless this form is received as required by existing law and regulations (42 CFR 424.32).

NOTICE: Any one who misrepresents or falsifies essential information to receive payment from Federal funds requested by this form may upon conviction be subject to fine and imprisonment under applicable Federal laws.

### NOTICE TO PATIENT ABOUT THE COLLECTION AND USE OF MEDICARE, CHAMPUS, FECA, AND BLACK LUNG INFORMATION
### (PRIVACY ACT STATEMENT)

We are authorized by HCFA, CHAMPUS and OWCP to ask you for information needed in the administration of the Medicare, CHAMPUS, FECA, and Black Lung programs. Authority to collect information is in section 205(a), 1862, 1872 and 1874 of the Social Security Act as amended, 42 CFR 411.24(a) and 424.5(a) (6), and 44 USC 3101;41 CFR 101 et seq and 10 USC 1079 and 1086; 5 USC 8101 et seq; and 30 USC 901 et seq; 38 USC 613; E.O. 9397.

The information we obtain to complete claims under these programs is used to identify you and to determine your eligibility. It is also used to decide if the services and supplies you received are covered by these programs and to insure that proper payment is made.

The information may also be given to other providers of services, carriers, intermediaries, medical review boards, health plans, and other organizations or Federal agencies, for the effective administration of Federal provisions that require other third parties payers to pay primary to Federal program, and as otherwise necessary to administer these programs. For example, it may be necessary to disclose information about the benefits you have used to a hospital or doctor. Additional disclosures are made through routine uses for information contained in systems of records.

FOR MEDICARE CLAIMS: See the notice modifying system No. 09-70-0501, titled, 'Carrier Medicare Claims Record,' published in the _Federal Register_, Vol. 55 No. 177, page 37549, Wed. Sept. 12, 1990, or as updated and republished.

FOR OWCP CLAIMS: Department of Labor, Privacy Act of 1974, "Republication of Notice of Systems of Records," _Federal Register_ Vol. 55 No. 40, Wed Feb. 28, 1990, See ESA-5, ESA-6, ESA-12, ESA-13, ESA-30, or as updated and republished.

FOR CHAMPUS CLAIMS: PRINCIPLE PURPOSE(S): To evaluate eligibility for medical care provided by civilian sources and to issue payment upon establishment of eligibility and determination that the services/supplies received are authorized by law.

ROUTINE USE(S): Information from claims and related documents may be given to the Dept. of Veterans Affairs, the Dept. of Health and Human Services and/or the Dept. of Transportation consistent with their statutory administrative responsibilities under CHAMPUS/CHAMPVA; to the Dept. of Justice for representation of the Secretary of Defense in civil actions; to the Internal Revenue Service, private collection agencies, and consumer reporting agencies in connection with recoupment claims; and to Congressional Offices in response to inquiries made at the request of the person to whom a record pertains. Appropriate disclosures may be made to other federal, state, local, foreign government agencies, private business entities, and individual providers of care, on matters relating to entitlement, claims adjudication, fraud, program abuse, utilization review, quality assurance, peer review, program integrity, third-party liability, coordination of benefits, and civil and criminal litigation related to the operation of CHAMPUS.

DISCLOSURES: Voluntary; however, failure to provide information will result in delay in payment or may result in denial of claim. With the one exception discussed below, there are no penalties under these programs for refusing to supply information. However, failure to furnish information regarding the medical services rendered or the amount charged would prevent payment of claims under these programs. Failure to furnish any other information, such as name or claim number, would delay payment of the claim. Failure to provide medical information under FECA could be deemed an obstruction.

It is mandatory that you tell us if you know that another party is responsible for paying for your treatment. Section 1128B of the Social Security Act and 31 USC 3801-3812 provide penalties for withholding this information.

You should be aware that P.L. 100-503, the "Computer Matching and Privacy Protection Act of 1988", permits the government to verify information by way of computer matches.

### MEDICAID PAYMENTS (PROVIDER CERTIFICATION)

I hereby agree to keep such records as are necessary to disclose fully the extent of services provided to individuals under the State's Title XIX plan and to furnish information regarding any payments claimed for providing such services as the State Agency or Dept. of Health and Humane Services may request.

I further agree to accept, as payment in full, the amount paid by the Medicaid program for those claims submitted for payment under that program, with the exception of authorized deductible, coinsurance, co-payment or similar cost-sharing charge.

SIGNATURE OF PHYSICIAN (OR SUPPLIER): I certify that the services listed above were medically indicated and necessary to the health of this patient and were personally furnished by me or my employee under my personal direction.

NOTICE: This is to certify that the foregoing information is true, accurate and complete. I understand that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws.

Public reporting burden for this collection of information is estimated to average 15 minutes per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing the burden, to HCFA, Office of Financial Management, P.O. Box 26684, Baltimore, MD 21207; and to the Office of Management and Budget, Paperwork Reduction Project (OMB-0938-0008), Washington, D.C. 20503.

EXHIBIT A

Page 2 of 2



EXHIBIT
B

UB04_Backer_9-1-06  09/05/2006  2:56 PM  Page 1

**UB-04 NOTICE:** THE SUBMITTER OF THIS FORM UNDERSTANDS THAT MISREPRESENTATION OR FALSIFICATION OF ESSENTIAL INFORMATION AS REQUESTED BY THIS FORM, MAY SERVE AS THE BASIS FOR CIVIL MONETARTY PENALTIES AND ASSESSMENTS AND MAY UPON CONVICTION INCLUDE FINES AND/OR IMPRISONMENT UNDER FEDERAL AND/OR STATE LAW(S).

Submission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts. The following certifications or verifications apply where pertinent to this Bill:

1. If third party benefits are indicated, the appropriate assignments by the insured /beneficiary and signature of the patient or parent or a legal guardian covering authorization to release information are on file. Determinations as to the release of medical and financial information should be guided by the patient or the patient's legal representative.

2. If patient occupied a private room or required private nursing for medical necessity, any required certifications are on file.

3. Physician's certifications and re-certifications, if required by contract or Federal regulations, are on file.

4. For Religious Non-Medical facilities, verifications and if necessary re-certifications of the patient's need for services are on file.

5. Signature of patient or his representative on certifications, authorization to release information, and payment request, as required by Federal Law and Regulations (42 USC 1935f, 42 CFR 424.36, 10 USC 1071 through 1086, 32 CFR 199) and any other applicable contract regulations, is on file.

6. The provider of care submitter acknowledges that the bill is in conformance with the Civil Rights Act of 1964 as amended. Records adequately describing services will be maintained and necessary information will be furnished to such governmental agencies as required by applicable law.

7. For Medicare Purposes: If the patient has indicated that other health insurance or a state medical assistance agency will pay part of his/her medical expenses and he/she wants information about his/her claim released to them upon request, necessary authorization is on file. The patient's signature on the provider's request to bill Medicare medical and non-medical information, including employment status, and whether the person has employer group health insurance which is responsible to pay for the services for which this Medicare claim is made.

8. For Medicaid purposes: The submitter understands that because payment and satisfaction of this claim will be from Federal and State funds, any false statements, documents, or concealment of a material fact are subject to prosecution under applicable Federal or State Laws.

9. For TRICARE Purposes:

   (a) The information on the face of this claim is true, accurate and complete to the best of the submitter's knowledge and belief, and services were medically necessary and appropriate for the health of the patient;

(b) The patient has represented that by a reported residential address outside a military medical treatment facility catchment area he or she does not live within the catchment area of a U.S. military medical treatment facility, or if the patient resides within a catchment area of such a facility, a copy of Non-Availability Statement (DD Form 1251) is on file, or the physician has certified to a medical emergency in any instance where a copy of a Non-Availability Statement is not on file;

(c) The patient or the patient's parent or guardian has responded directly to the provider's request to identify all health insurance coverage, and that all such coverage is identified on the face of the claim except that coverage which is exclusively supplemental payments to TRICARE-determined benefits;

(d) The amount billed to TRICARE has been billed after all such coverage have been billed and paid excluding Medicaid, and the amount billed to TRICARE is that remaining claimed against TRICARE benefits;

(e) The beneficiary's cost share has not been waived by consent or failure to exercise generally accepted billing and collection efforts; and,

(f) Any hospital-based physician under contract, the cost of whose services are allocated in the charges included in this bill, is not an employee or member of the Uniformed Services. For purposes of this certification, an employee of the Uniformed Services is an employee, appointed in civil service (refer to 5 USC 2105), including part-time or intermittent employees, but excluding contract surgeons or other personal service contracts. Similarly, member of the Uniformed Services does not apply to reserve members of the Uniformed Services not on active duty.

(g) Based on 42 United States Code 1395cc(a)(1)(j) all providers participating in Medicare must also participate in TRICARE for inpatient hospital services provided pursuant to admissions to hospitals occurring on or after January 1, 1987; and

(h) If TRICARE benefits are to be paid in a participating status, the submitter of this claim agrees to submit this claim to the appropriate TRICARE claims processor. The provider of care submitter also agrees to accept the TRICARE determined reasonable charge as the total charge for the medical services or supplies listed on the claim form. The provider of care will accept the TRICARE-determined reasonable charge even if it is less than the billed amount, and also agrees to accept the amount paid by TRICARE combined with the cost-share amount and deductible amount, if any, paid by or on behalf of the patient as full payment for the listed medical services or supplies. The provider of care submitter will not attempt to collect from the patient (or his or her parent or guardian) amounts over the TRICARE determined reasonable charge. TRICARE will make any benefits payable directly to the provider of care, if the provider of care is a participating provider.

SEE http://www.nubc.org/ FOR MORE INFORMATION ON UB-04 DATA ELEMENT AND PRINTING SPECIFICATIONS

EXHIBIT B
Page 2 of 2

# Medicare Benefit Policy Manual
# Chapter 2 - Inpatient Psychiatric Hospital Services

**Table of Contents**
*(Rev. 223, 05-13-16)*

## Transmittals for Chapter 2

10 - Inpatient Psychiatric Facility Services

      10.1 - Background

      10.2 - Statutory Requirements

      10.3 - Affected Medicare Providers

20 - Admission Requirements

30 - Medical Records Requirements

      30.1 - Development of Assessment/Diagnositic Data

      30.2 - Psychiatric Evaluation

            30.2.1 - Certification and Recertification Requirements

                  30.2.1.1 - Certification

                  30.2.1.2 - Recertification

                  *30.2.1.3 - Delayed/Lapsed Certification and Recertification*

            30.2.2 - Active Treatment

                  30.2.2.1 - Principals for Evaluating a Period of Active Treatment

            30.2.3 - Services Supervised and Evaluated by a Physician

      30.3 - Treatment Plan

            30.3.1 - Individualized Treatment or Diagnostic Plan

            30.3.2 - Services Expected to Improve the Condition or for Purpose of Diagnosis

30.4 - Recording Progress

30.5 - Discharge Planning and Discharge Summary

40 - Personnel Requirements

      40.1 - Director of Inpatient Psychiatric Services; Medical Staff

      40.2 - Nursing Services

50 - Psychological Services

60 - Social Services

70 - Therapeutic Activities

80 - Benefit Application

90 - Benefits Exhaust



EXHIBIT
C

EXHIBIT C
Page 1 of 15
Page 41

## 10 - Inpatient Psychiatric Facility Services
(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)

### 10.1 - Background
This section and its subsections provide instructions about the Inpatient Psychiatric
Facility Prospective Payment System (IPF PPS). The IPF PPS replaces the existing
reasonable cost/Tax Equity and Fiscal Responsibility Act (TEFRA) based payments
subject to TEFRA limits under §1886 (b) of the Social Security Act (the Act) for
discharges beginning on and after the first day of the IPF's first cost reporting period
beginning on or after January 1, 2005.

The IPF PPS, codified at 42 CFR 412, Subpart N, provides payment for inpatient
psychiatric treatment when provided to a patient in psychiatric hospitals, and distinct part
psychiatric units of acute care hospitals and critical access hospitals (CAHs). Psychiatric
hospitals and psychiatric units that used to be paid reasonable-cost under TEFRA,
§1886(b) of the Act, are now paid under the IPF PPS.

The term "inpatient psychiatric facility services" means inpatient hospital services
furnished to a patient of an inpatient psychiatric facility. IPFs are certified under
Medicare as inpatient psychiatric hospitals and distinct psychiatric units of acute care
hospitals and CAHs.

### 10.2 - Statutory Requirements
(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)

Section 124 of the Medicare, Medicaid, and SCHIP (State Children's Health Insurance
Program) Balanced Budget Refinement Act of 1999 (BBRA) (Pub. L.106-113),
mandated that the Secretary—(1) develop a per diem PPS for inpatient hospital services
furnished in psychiatric hospitals and psychiatric units; (2) include in the PPS an
adequate patient classification system that reflects the differences in patient resource use
and costs among psychiatric hospitals and psychiatric units; (3) maintain budget
neutrality; (4) permit the Secretary to require psychiatric hospitals and psychiatric units to
submit information necessary for the development of the PPS; and (5) submit a report to
the Congress describing the development of the PPS. Section 124 of the BBRA also
required that the IPF PPS be implemented for cost reporting periods beginning on or after
October 1, 2002.

The Medicare Prescription Drug, Improvement, and Modernization Act of 2003 (MMA)
(Pub. L. 108-173), section 405(g) extended the IPF PPS to distinct part psychiatric units
of CAHs, effective for cost reporting periods beginning on or after October 1, 2004.

### 10.3 - Affected Medicare Providers
(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)

IPFs are certified under Medicare as inpatient psychiatric hospitals, which means, an
institution that is primarily engaged in providing, by or under the supervision of a

EXHIBIT C
Page 2 of 15

physician, psychiatric services for the diagnosis and treatment of mentally ill patients, maintains clinical records necessary to determine the degree and intensity of the treatment provided to the mentally ill patient, and meets staffing requirements sufficient to carry out active programs of treatment for individuals who are furnished care in the institution. A distinct part psychiatric unit may also be certified if it meets the clinical record and staffing requirements in 42 CFR 412.27 for a "psychiatric hospital."

The regulations at 42 CFR 412.402 define an IPF as a hospital that meets the requirements specified in 42 CFR 412.22 and 42 CFR412.23(a), 42 CFR 482.60, 42 CFR 482.61, and 42 CFR 482.62, and units that meet the requirements specified in 42 CFR 412.22, 42 CFR 412.25, and 42 CFR 412.27.

The IPF PPS does not change the basic criteria for a hospital or hospital unit to be classified as a psychiatric hospital or psychiatric unit that is excluded from the hospital prospective payment systems under §1886(d) and §1886(g) of the Act, nor does it revise the survey and certification procedures applicable to entities seeking this classification.

The provider number ranges (Online Survey and Certification and Reporting System (OSCAR) number) for IPFs are from xx-4000 through xx-4499, xx-Sxxx, and xx-Mxxx. Note that this will change with the implementation of the National Provider Identifiers (NPI).

The following hospitals are not included in IPF PPS.

- Veterans Administration hospitals; see 42 CFR 412.22 (c).

- Hospitals that are reimbursed under state cost control systems approved under 42 CFR Part 403; Psychiatric hospitals (provider numbers xx-4000 – xx-4499) in the State of Maryland are paid under the IPF PPS. Psychiatric distinct part units located in an acute care hospital in Maryland identified by 'S' in the third position of the OSCAR number are waived from the IPF PPS, as are the acute hospital in which they are located. Currently there are no CAHs in Maryland.

- Hospitals that are reimbursed in accordance with demonstration projects authorized under 42 CFR 402(a) of Pub.L. 90-248 (42 U. S. C. 1395b-1) or §222(a) of Pub.L. 92-603 (42 U. S. C. 1395b-1); IPFs in acute care hospitals that are paid in accordance with demonstration projects are paid in accordance with the demonstration project;

- Nonparticipating hospitals furnishing emergency services to Medicare beneficiaries. See 42 CFR 412.22(c).

Payments to foreign hospitals are made in accordance with the provisions set forth in 42 CFR 413.74.

## 20 - Admission Requirements

EXHIBIT C
Page 3 of 15

**(Rev. 194, Issued: 09-03-14, Effective: Upon Implementation of ICD-10, Implementation: Upon Implementation of ICD-10)**

For all IPFs, a provisional or admitting diagnosis must be made on every patient at the time of admission, and must include the diagnosis of comorbid diseases as well as the psychiatric diagnosis.

In addition, according to 42 CFR 412.27(a) and 42 CFR 482.61, distinct part psychiatric units of acute care hospitals and CAHs are required to admit only those patients whose admission to the unit is required for active treatment, of an intensity that can be provided appropriately only in an inpatient hospital setting, of a psychiatric principal diagnosis that is listed in the Fourth Edition, Text Revision of the American Psychiatric Association's Diagnostic and Statistical Manual, or in Chapter Five of the International Classification of Diseases applicable to the service date. Psychiatric hospitals are required to be primarily engaged in providing, by or under the supervision of a psychiatrist, psychiatric services for the diagnosis and treatment of mentally ill persons, according to 42 CFR 412.23(a).

## 30 - Medical Records Requirements
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

The medical records maintained by an IPF must permit determination of the degree and intensity of the treatment provided to individuals who are furnished services in the institution, according to 42 CFR 412.27 and 42 CFR 482.61.

In addition, consistent with sound clinical practice, all medical records, including progress notes and treatment plan, should be legible and complete, and should be promptly signed and dated by the person (identified by name and discipline) who is responsible for ordering, providing or evaluating the service furnished.

## 30.1 - Development of Assessment/Diagnostic Data
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

Medical records must stress the psychiatric components of the record, including history of findings and treatment provided for the psychiatric condition for which the patient is hospitalized.

(1) The identification data must include the patient's legal status.

(2) A provisional or admitting diagnosis must be made on every patient at the time of admission, and must include the diagnoses of comorbid diseases as well as the psychiatric diagnoses.

(3) The reasons for admission must be clearly documented as stated by the patient and/or others significantly involved.

EXHIBIT C
Page 4 of 15
Page 44

     (4) The social service records, including reports of interviews with patients, family members, and others, must provide an assessment of home plans and family attitudes, and community resource contacts as well as a social history.

     (5) When indicated, a complete neurological examination must be recorded at the time of the admission physical examination.

## 30.2 - Psychiatric Evaluation
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

Each patient must receive a psychiatric evaluation that must—

     (1) Be completed within 60 hours of admission;

     (2) Include a medical history;

     (3) Contain a record of mental status;

     (4) Note the onset of illness and the circumstances leading to admission;

     (5) Describe attitudes and behavior;

     (6) Estimate intellectual functioning, memory functioning, and orientation; and

     (7) Include an inventory of the patient's assets in descriptive, not interpretative fashion.

## 30.2.1 - Certification and Recertification Requirements
*(Rev. 223, Issued: 05-13-16, Effective: 08-15-16, Implementation: 08-13-16)*

## 30.2.1.1 - Certification
*(Rev. 223, Issued: 05-13-16, Effective: 08-15-16, Implementation: 08-13-16)*

The certification that a physician must provide, with respect to IPF services, is *documentation* that the services furnished can reasonably be expected to improve the patient's condition or for diagnostic study. The certification is required at the time of admission or as soon thereafter that is reasonable and practicable. See Pub.100-01, Medicare General Information, Eligibility and Entitlement Manual, chapter 4, §10.9, for certification requirements.

## 30.2.1.2 - Recertification
*(Rev. 223, Issued: 05-13-16, Effective: 08-15-16, Implementation: 08-13-16)*

If the patient continues to require active inpatient psychiatric treatment, then a physician must recertify as of the 12th day of hospitalization (with subsequent recertifications required at intervals established by the IPF's Utilization Review committee on a case-by-

EXHIBIT C
Page 5 of 15
Page 45

case basis, but no less frequently than every 30 days) that the services were and continue to be required for treatment that could reasonably be expected to improve the patient's condition, or for diagnostic study, and that the patient continues to need, on a daily basis, active treatment furnished directly by or requiring the supervision of inpatient psychiatric facility personnel. In addition, the hospital records should show that services furnished were intensive treatment services, admission or related services, or equivalent services. See Pub.100-01, Medicare General Information, Eligibility and Entitlement Manual, chapter 4, §10.9, for recertification requirements.

*The format of all certifications and recertifications and the method by which they are obtained is determined by the individual facility. No specific procedures or forms are required. The provider may adopt any method that permits verification of all the IPFs requirements to continue treatment. For example, the recertification may be entered on provider generated forms, in progress notes, or in the records (relating to the stay in question) and must be signed by a physician.*

*Claim denials may not be made for failure to use a certification or recertification form or failure to use particular language or format, provided that the medical record demonstrates the content requirements given at §30.2.1 are met.*

### 30.2.1.3 - Delayed/Lapsed Certification and Recertification
*(Rev. 223, Issued: 05-13-16, Effective: 08-15-16, Implementation: 08-13-16)*

*IPFs are expected to obtain timely certifications and recertifications. However, delayed certifications and recertifications will be honored where, for instance, there have been an oversight or lapse, and a legitimate reason for the delay as noted in Pub. 100-01, §20.1. Denial of payment for lack of the required certification and recertification is considered a technical denial, which means a statutory requirement has not been met. Consequently, if an appropriate certification is later produced, the denial shall be overturned. Reopenings of technical denial decisions may be initiated by the contractor or the provider.*

*In addition to compliance with the appropriate certification and recertification content requirements, delayed certification and recertification must include an explanation for the delay and any medical or other evidence which the IPF considers relevant for purposes of explaining the delay. The IPF will determine the format of the delayed certifications and recertifications, and the method by which they are obtained. A delayed certification may be included with one or more recertifications on a single signed document. Separate signed documents for each delayed certification and recertification are not required as they would be if timely certification and recertification had been completed. For all IPF services, a delayed certification may not extend past discharge. IPF certification or recertification documentation may only be signed by a physician.*

### 30.2.2 - Active Treatment
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

EXHIBIT C
Page 6 of 15
Page 46

Payment for IPF services is to be made only for "active treatment" that can reasonably be expected to improve the patient's condition. To assure that payment is made only under such circumstances, the law includes certain requirements that must be met before the services furnished in an IPF can be covered, including medical necessity and certification.

### 30.2.2.1 - Principles for Evaluating a Period of Active Treatment
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

In the context of IPF services, emphasis is placed on the presence of active treatment and, therefore, this determination is the crucial one. Simply applying the skilled care definition for general hospitals is not sufficient for determining whether payment may be made since that definition does not take into account the patient's potential for improvement nor was it designed to permit the more sophisticated judgments required by the concept of active treatment. For services in an IPF to be designated as active treatment, they must be:

- Provided under an individualized treatment or diagnostic plan;

- Reasonably expected to improve the patient's condition or for the purpose of diagnosis; and

- Supervised and evaluated by a physician.

Such factors as diagnosis, length of hospitalization, and the degree of functional limitation, while useful as general indicators of the kind of care most likely being furnished in a given situation, are not controlling in deciding whether the care was active treatment. Refer to 42 CFR 482.61, Conditions of Participation for Hospitals, for a full description of what constitutes active treatment.

The period of time covered by the physician's certification is referred to as a period of active treatment. This period should include all days on which inpatient psychiatric facility services were provided because of the individual's need for active treatment (not just the days on which specific therapeutic or diagnostic services are rendered). For example, a patient's program of treatment may necessitate the discontinuance of therapy for a period of time or it may include a period of observation, either in preparation for or as a follow-up to therapy, while only maintenance or protective services are furnished. If such periods were essential to the overall treatment plan, they would be regarded as part of the period of active treatment.

The fact that a patient is under the supervision of a physician does not necessarily mean the patient is getting active treatment. For example, medical supervision of a patient may be necessary to assure the early detection of significant changes in his/her condition; however, in the absence of a specific program of therapy designed to effect improvement, a finding that the patient is receiving active treatment would be precluded.

EXHIBIT C
Page 7 of 15
Page 47

The program's definition of active treatment does not automatically exclude from coverage services rendered to patients who have conditions that ordinarily result in progressive physical and/or mental deterioration. Although patients with such diagnosis will most commonly be receiving custodial care, they may also receive services that meet the program's definition of active treatment (e.g., where a patient with Alzheimer's disease or Pick's disease received services designed to alleviate the effects of paralysis, epileptic seizures, or some other neurological symptom, or where a patient in the terminal stages of any disease received life-supportive care). A period of hospitalization during which services of this kind were furnished would be regarded as a period of active treatment.

### 30.2.3 - Services Supervised and Evaluated by a Physician
(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)

The types of services which meet the above requirements would include not only psychotherapy, drug therapy, and electroconvulsive therapy, but also such therapeutic activities as occupational therapy, recreational therapy, and milieu therapy, provided the therapeutic activities are expected to result in improvement in the patient's condition. If the only activities prescribed for the patient are primarily diversional in nature, (i.e., to provide some social or recreational outlet for the patient), it would not be regarded as treatment to improve the patient's condition. In many large hospitals these adjunctive services are present and part of the life experience of every patient. In a case where milieu therapy, (or one of the other therapeutic activities is involved), it is particularly important that this therapy be a planned program for the particular patient and not one where life in the hospital is designated as milieu therapy.

In addition, the administration of antidepressant or tranquilizing drugs that are expected to significantly alleviate a patient's psychotic or neurotic symptoms would be termed active treatment (assuming that the other elements of the definitions are met). However, the administration of a drug or drugs does not necessarily constitute active treatment.

Physician participation in the services is an essential ingredient of active treatment. The services of qualified individuals other than physicians, e.g., social workers, occupational therapists, group therapists, attendants, etc., must be prescribed and directed by a physician to meet the specific psychiatric needs of the individual. In short, the physician must serve as a source of information and guidance for all members of the therapeutic team who work directly with the patient in various roles. It is the responsibility of the physician to periodically evaluate the therapeutic program and determine the extent to which treatment goals are being realized and whether changes in direction or emphasis are needed. Such evaluation should be made on the basis of periodic consultations and conferences with therapists, reviews of the patient's medical record, and regularly scheduled patient interviews, at least once per week.

When the physician periodically evaluates the therapeutic program to determine the extent to which treatment goals are being realized and whether changes in direction or emphasis are needed (based on consultations and conferences with therapists, review of

EXHIBIT C
Page 8 of 15
Page 48

the patient's progress as recorded on the medical record and the physician's periodic conversations with the patient), active treatment would be indicated. A finding that a patient is not receiving active treatment will not in itself preclude payment for physicians' services under Medicare Part B. As long as the professional services rendered by the physician are reasonable and necessary for the care of the patient, such services would be reimbursable under the medical insurance program.

## 30.3 - Treatment Plan
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

The services must be provided in accordance with an individualized program of treatment or diagnosis developed by a physician in conjunction with staff members of appropriate other disciplines on the basis of a thorough evaluation of the patient's restorative needs and potentialities. The plan of treatment must be recorded in the patient's medical record in accordance with 42 CFR 482.61, Conditions of Participation for Hospitals.

## 30.3.1 - Individualized Treatment or Diagnostic Plan
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

Each patient must have an individual comprehensive treatment plan that must be based on an inventory of the patient's strengths and disabilities. The written plan must include—

> (1) A substantiated diagnosis;
>
> (2) Short-term and long-range goals;
>
> (3) The specific treatment modalities utilized;
>
> (4) The responsibilities of each member of the treatment team; and
>
> (5) Adequate documentation to justify the diagnosis and the treatment and rehabilitation activities carried out.

The treatment furnished to the patient should be documented in the medical record in such a manner and with such frequency as to assure that all active therapeutic efforts are included, as well as provide a full picture of the therapy administered as well as an assessment of the patient's reaction to it.

## 30.3.2 - Services Expected to Improve the Condition or for Purpose of Diagnosis
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

The services provided must reasonably be expected to improve the patient's condition or must be for the purpose of diagnostic study. It is not necessary that a course of therapy have as its goal the restoration of the patient to a level which would permit discharge

EXHIBIT C
Page 9 of 15
Page 49

from the institution although the treatment must, at a minimum, be designed both to reduce or control the patient's psychotic or neurotic symptoms that necessitated hospitalization and improve the patient's level of functioning.

## 30.4 - Recording Progress
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

Progress notes must be recorded by the doctor of medicine or osteopathy responsible for the care of the patient, a nurse, social worker and, when appropriate, others significantly involved in active treatment modalities. The frequency of progress notes is determined by the condition of the patient but must be recorded at least weekly for the first 2 months and at least once a month thereafter and must contain recommendations for revisions in the treatment plan as indicated as well as precise assessment of the patient's progress in accordance with the original or revised treatment plan.

As outlined above in §30 of this chapter, consistent with sound clinical practice, all medical records, including progress notes, should be legible and complete, and should be promptly signed and dated by the person (identified by name and discipline) who is responsible for ordering, providing, or evaluating the service furnished.

## 30.5 - Discharge Planning and Discharge Summary
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

The record of each patient who has been discharged must have a discharge summary that includes a recapitulation of the patient's hospitalization and recommendations from appropriate services concerning follow-up or aftercare as well as a brief summary of the patient's condition on discharge.

## 40 - Personnel Requirements
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

IPFs must have adequate numbers of qualified professional and supportive staff, according to 42 CFR 412.27 and 42 CFR 482.62.

IPFs must employ or undertake to provide adequate numbers of qualified professional, technical, and consultative personnel to:

(1) Evaluate patients;

(2) Formulate written individualized, comprehensive treatment plans;

(3) Provide active treatment measures; and

(4) Engage in discharge planning.

EXHIBIT C
Page 10 of 15
Page 50

Doctors of medicine or osteopathy and other appropriate professional personnel must be available to provide necessary medical and surgical diagnostic and treatment services. If medical and surgical diagnostic and treatment services are not available within the institution, the institution must have an agreement with an outside source of these services to ensure that they are immediately available or a satisfactory agreement must be established for transferring patients to a general hospital that participates in the Medicare program.

## 40.1 - Director of Inpatient Psychiatric Services; Medical Staff
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

Inpatient psychiatric services must be under the supervision of a clinical director, service chief, or equivalent who is qualified to provide the leadership required for an intensive treatment program. The number and qualifications of doctors of medicine and osteopathy must be adequate to provide essential psychiatric services.

(1) The clinical director, service chief, or equivalent must meet the training and experience requirements for examination by the American Board of Psychiatry and Neurology or the American Osteopathic Board of Neurology and Psychiatry.

(2) The director must monitor and evaluate the quality and appropriateness of services and treatment provided by the medical staff.

## 40.2 - Nursing Services
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

IPFs must have a qualified director of psychiatric nursing services. In addition to the director of nursing, there must be adequate numbers of registered nurses, licensed practical nurses, and mental health workers to provide nursing care necessary under each patient's active treatment program and to maintain progress notes on each patient.

(1) The director of psychiatric nursing services must be a registered nurse who has a master's degree in psychiatric or mental health nursing, or its equivalent from a school of nursing accredited by the National League for Nursing, or be qualified by education and experience in the care of the mentally ill. The director must demonstrate competence to participate in interdisciplinary formulation of individual treatment plans; to give skilled nursing care and therapy; and to direct, monitor, and evaluate the nursing care furnished.

(2) The staffing pattern must insure the availability of a registered nurse 24 hours each day. There must be adequate numbers of registered nurses, licensed practical nurses, and mental health workers to provide the nursing care necessary under each patient's active treatment program.

## 50 - Psychological Services
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

EXHIBIT C
Page 11 of 15
Page 51

The IPF must provide or have available psychological services to meet the needs of the patients. The services must be furnished in accordance with acceptable standards of practice, service objectives, and established policies and procedures, according to 42 CFR 412.27 and 42 CFR 482.62.

## 60 – Social Services
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

There must be a director of social services who monitors and evaluates the quality and appropriateness of social services furnished. The services must be furnished in accordance with accepted standards of practice and established policies and procedures, according to 42 CFR 412.27 and 42 CFR 482.62.

1. The director of the social work department or service must have a Master's degree from an accredited school of social work or must be qualified by education and experience in the social services needs of the mentally ill. If the director does not hold a Master's degree in social work, at least one staff member must have this qualification.

2. Social service staff responsibilities must include, but are not limited to, participating in discharge planning, arranging for follow-up care, and developing mechanisms for exchange of appropriate information with sources outside the hospital.

## 70 – Therapeutic Activities
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

According to 42 CFR 412.27 and 42 CFR 482.62 IPFs must provide a therapeutic activities program.

(1) The program must be appropriate to the needs and interests of patients and be directed toward restoring and maintaining optimal levels of physical and psychosocial functioning.

(2) The number of qualified therapists, support personnel, and consultants must be adequate to provide comprehensive therapeutic activities consistent with each patient's active treatment program.

## 80 – Benefit Application
**(Rev. 59, Issued: 11-09-06, Effective: 01-01-05, Implementation: 12-04-06)**

The psychiatric benefit application (190 days) applies to freestanding psychiatric hospitals per 42 CFR 409.62. The 190-lifetime limitation does not apply to certified psychiatric distinct part units. Section 409.62 states, "There is a lifetime maximum of 190 days on inpatient psychiatric hospital services available to any beneficiary.

EXHIBIT C
Page 12 of 15
Page 52

Therefore, once an individual receives benefits for 190 days of care in a psychiatric hospital, no further benefits of that type are available to that individual."

Payment may not be made for more than a total of 190 days of inpatient psychiatric hospital services during the patient's lifetime. This limitation applies only to services furnished in a psychiatric hospital. This limitation does not apply to inpatient psychiatric services furnished in a distinct part psychiatric unit of an acute care hospital or CAH. The period spent in a psychiatric hospital prior to entitlement does not count against the patient's lifetime limitation, even though pre-entitlement days may have been counted against the 150 days of eligibility in the first benefit period.

The CWF keeps track of days paid for inpatient psychiatric services and informs the A/B MAC (A) on claims where the 190-day limit is reached.

For a more detailed description, see Pub. 100-02, Medicare Benefit Policy Manual, chapter 3, §30.C. "Lifetime Inpatient Psychiatric Hospital Limitation" and chapter 4, §50 "Inpatient Psychiatric Hospital Services - Lifetime Limitation" for the 190-day lifetime limitation on payment for inpatient psychiatric hospital services. For details concerning the pre-entitlement inpatient psychiatric benefit reduction provision see Pub. 100-02, Medicare Benefit Policy Manual, chapter 4, §§10 - 50.

## 90 - Benefits Exhaust
(Rev. 69; Issued: 04-27-07; Effective: 12-03-07; Implementation: 12-03-07)

Effective December 3, 2007, for payment purposes, an IPF discharge occurs when benefits exhaust and the benefits exhaust date will substitute for the discharge date. The claim will be paid either on the discharge date if the benefits are available or on benefit exhaust date if the discharge is after the benefits exhaust date. When the services actually are provided, the PRICER version used to price claims for the time will be used. No pay/110 TOBs are allowed instead of continually adjusting the claims (117 TOB) until actual discharge occurs once benefits exhaust.

Under the Tax Equity and Fiscal Responsibility Act (TEFRA), the Provider Statistical and Reimbursement (PS&R) report used the benefits exhaust date as the discharge date. This changed when the IPF PPS was implemented, and the 'actual' discharge date was used. The days stay with the year they occurred, making it easier for the PS&R report (especially during the blend period) to settle the cost report. This means that:

1. Claims will be settled on the appropriate cost report;

2. The appropriate PPS-TEFRA blend percentage will be paid;

3. Patients with long lengths of stay will be counted on the correct PS&R report; and

EXHIBIT C
Page 13 of 15
Page 53

4. The PRICER version used will be the one in effect at the time the services were provided.

EXHIBIT C
Page 14 of 15
Page 54

**Transmittals Issued for this Chapter**

| Rev # | Issue Date | Subject | Impl Date | CR# |
|-------|-----------|---------|-----------|-----|
| R223BP | 05/13/2016 | Clarification of Inpatient Psychiatric Facilities (IPF) Requirements for Certification, Recertification and Delayed/Lapsed Certification and Recertification | 08/15/2016 | 9522 |
| R194BP | 09/03/2014 | Pub. 100-02 Language-Only Update for ICD-10 | Upon Implementation of ICD-10 | 8605 |
| R181BP | 03/14/2014 | Pub. 100-02 Language-Only Update for ICD-10 – Rescinded and replaced by Transmittal 194 | 10/01/2014 | 8605 |
| R69BP | 04/27/2007 | Change to the Inpatient Psychiatric Facility Prospective Payment System (IPF PPS) Discharge Bill | 12/03/2007 | 5474 |
| R59BP | 11/09/2006 | Inpatient Psychiatric Facility Prospective Payment System (IPF PPS) | 12/04/2006 | 5287 |
| R56BP | 11/03/2006 | Inpatient Psychiatric Facility Prospective Payment System (IPF PPS) | 12/04/2006 | 5287 |
| R1BP | 10/01/2003 | Initial Publication of Manual | NA | NA |

Back to top of Chapter

EXHIBIT C
Page 15 of 15
Page 55

# Medicare Claims Processing Manual
## Chapter 3 - Inpatient Hospital Billing

**Table of Contents**
*(Rev. 3452, 02-04-16)*

### Transmittals for Chapter 3

10 - General Inpatient Requirements

    10.1 - Claim Formats

    10.2 - Focused Medical Review (FMR)

    10.3 - Spell of Illness

    10.4 - Payment of Nonphysician Services for Inpatients

    10.5 - Hospital Inpatient Bundling

20 - Payment Under Prospective Payment System (PPS) Diagnosis Related Groups (DRGs)

    20.1 - Hospital Operating Payments Under PPS

        20.1.1 - Hospital Wage Index

        20.1.2 - Outliers

            20.1.2.1 - Cost to Charge Ratios

            20.1.2.2 - Statewide Average Cost to Charge Ratios

            20.1.2.3 - Threshold and Marginal Cost

            20.1.2.4 - Transfers

            20.1.2.5 - Reconciliation

            20.1.2.6 - Time Value of Money

            20.1.2.7 - Procedure for Medicare contractors to Perform and Record Outlier Reconciliation Adjustments

            20.1.2.8 - Specific Outlier Payments for Burn Cases

            20.1.2.9 - Medical Review and Adjustments

            20.1.2.10 - Return Codes for Pricer

    20.2 - Computer Programs Used to Support Prospective Payment System

        20.2.1 - Medicare Code Editor (MCE)

            20.2.1.1 - Paying Claims Outside of the MCE



EXHIBIT

*D*

160.1 - Special Add-On Payments For New Technologies

    160.1.1 - Identifying Claims Eligible for the Add-On Payment for New Technology

    160.1.2 - Remittance Advice Impact

170 - Billing and Processing Instructions for Religious Nonmedical Health Care Institution (RNHCI) Claims

    170.1 - RNHCI Election Process

        170.1.1 - Requirement for RNHCI Election

        170.1.2 - Revocation of RNHCI Election

        170.1.3 - Completion of the Notice of Election for RNHCI

        170.1.4 - Common Working File (CWF) Processing of Elections, Revocations and Cancelled Elections

    170.2 - Billing Process for RNHCI Services

        170.2.1 - When to Bill for RNHCI Services

        170.2.2 - Required Data Elements on Claims for RNHCI Services

    170.3 - RNHCI Claims Processing By the Medicare Contractor with RNHCI Specialty Workload

        170.3.1 - RNHCI Claims Not Billed to Original Medicare

    170.4 - Informing Beneficiaries of the Results of RNHCI Claims Processing

180 - Processing Claims For Beneficiaries with RNHCI Elections by Contractors without RNHCI Specialty Workloads

    180.1 - Recording Determinations of Excepted/Nonexcepted Care on Claim Records

    180.2 - Informing Beneficiaries of the Results of Excepted/Nonexcepted Care Determinations by the Non-specialty Contractor

190 - Inpatient Psychiatric Facility Prospective Payment System (IPF PPS)

    190.1 - Background

    190.2 - Statutory Requirements

    190.3 - Affected Medicare Providers

    190.4 - Federal Per Diem Base Rate

    190.4.1 - Standardization Factor

    190.4.2 - Budget Neutrality

        190.4.2.1 - Budget Neutrality Components

    190.4.3 - Annual Update

    190.4.4 - Calculating the Federal Payment Rate

190.5 - Patient-Level Adjustments

190.5.1 - Diagnosis-Related Groups (DRGs) Adjustments

190.5.2 - Application of Code First

190.5.3 - Comorbidity Adjustments

190.5.4 - Age Adjustments

190.5.5 - Variable Per Diem Adjustments

190.6 - Facility-Level Adjustments

190.6.1 - Wage Index

190.6.2 - Rural Location Adjustment

190.6.3 - Teaching Status Adjustment

190.6.3.1 - Full-Time Equivalent (FTE) Resident Cap

190.6.3.2 - Reconciliation of Teaching Adjustment on Cost Report

190.6.4 - Emergency Department (ED) Adjustment

190.6.4.1 - Source of Admission for IPF PPS Claims for Payment of ED Adjustment

190.6.5 - Cost-of- Living Adjustment (COLA) for Alaska and Hawaii

190.7 - Other Payment Policies

190.7.1 - Interrupted Stays

190.7.2 - Outlier Policy

190.7.2.1 - How to Calculate Outlier Payments

190.7.2.2 - Determining the Cost-to-Charge Ratio

190.7.2.3 Outlier Reconciliation

190.7.2.4. Time Value of Money

190.7.2.5 - Procedures for Medicare Contractors to Perform and Record Outlier Reconciliation Adjustments

190.7.3 - Electroconvulsive Therapy (ECT) Payment

190.7.4 - Stop Loss Provision (Transition Period Only)

190.8 - Transition (Phase-In Implementation)

190.8.1 - Implementation Date for Provider

190.9 - Definition of New IPF Providers Versus TEFRA Providers

190.9.1 - New Providers Defined

190.10 - Claims Processing Requirements Under IPF PPS

- Hospitals that are reimbursed in accordance with demonstration projects authorized under §402(a) of Pub. L. 90-248 (42 U. S. C. 1395b-1) or §222(a) of Pub. L. 92-603 (42 U. S. C. 1395b-1); See 42 CFR 412.22 (c). IPFs in acute care hospitals that participate in demonstration projects are paid in accordance with the demonstration project;

- Nonparticipating hospitals furnishing emergency services to Medicare beneficiaries are paid in accordance with 42 CFR 412. 22 (c).

- Payment to foreign hospitals is made in accordance with the provisions set forth in 42 CFR 413.74.

### 190.4 - Federal Per Diem Base Rate
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

Payments to IPFs under the IPF PPS are based on a single Federal per diem base rate computed from both the inpatient operating and capital-related costs of IPFs (including routine and ancillary services), but not certain pass-through costs (i.e., bad debts, direct graduate medical education, and nursing and allied health education).

The Federal per diem payment under the IPF PPS is comprised of the Federal per diem base rate (which is broken into a labor-related share and a non-labor-related share) and applicable patient and facility adjustments that are described in §§190.5 and 190.6.

The standardized Federal per diem base rates and adjustment factors are updated July 1 every year, beginning July 1, 2006. For the updated standardized Federal per diem base rates for subsequent years refer to the **Federal Register** rules and accompanying Recurring Update Notifications. See
http://www.cms.gov/Medicare/Medicare-Fee-for-Service-Payment/InpatientPsychFacilPPS/IPF-PPS-Regulations-and-Notices.html

### 190.4.1 - Standardization Factor
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

The CMS standardized the IPF PPS Federal per diem base rate in order to account for the overall positive effects of the IPF PPS payment adjustment factors. To standardize the IPF PPS payments, CMS compared the IPF PPS payment amounts calculated from the FY 2002 MedPAR file to the projected TEFRA payments from the FY 2002 cost report file updated to the midpoint of the IPF PPS implementation period (that is, October 2005). The standardization factor was calculated by dividing total estimated payments under the TEFRA payment system by estimated payments under the IPF PPS. CMS then applied this factor to the average per diem cost of an IPF stay.

### 190.4.2 - Budget Neutrality
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

EXHIBIT D
Page 4 of 9

| Description of Comorbidity | Adjustment Factor |
|---|---|
| Gangrene | 1.10 |
| Chronic Obstructive Pulmonary Disease | 1.12 |
| Artificial Openings - Digestive and Urinary | 1.08 |
| Severe Musculoskeletal and Connective Tissue Diseases | 1.09 |
| Poisoning | 1.11 |

### 190.5.4 - Age Adjustments
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

The IPF PPS has an age adjustment with 9 age categories; under 45, over 80, and categories in 5 year groupings in between. IPFs receive this adjustment for each day of the stay. The age adjustment is determined based on the age at admission and does not change regardless of the length of stay.

| | |
|---|---|
| Under 45 | 1.00 |
| 45 and under 50 | 1.01 |
| 50 and under 55 | 1.02 |
| 55 and under 60 | 1.04 |
| 60 and under 65 | 1.07 |
| 65 and under 70 | 1.10 |
| 70 and under 75 | 1.13 |
| 75 and under 80 | 1.15 |
| 80 and over | 1.17 |

### 190.5.5 - Variable Per Diem Adjustments
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

The variable per diem adjustments account for the ancillary and certain administrative costs that occur disproportionately in the first days after admission to an IPF. The variable per diem adjustments decline each day of the patient's stay through day 21. After day 21, the adjustments remain the same each day for the remainder of the stay.

| | |
|---|---|
| Day 1 - Facility Without a Qualifying Emergency Department | 1.19 |

| | |
|---|---|
| Day 1 - Facility With a Qualifying Emergency Department | 1.31 |
| Day 2 | 1.12 |
| Day 3 | 1.08 |
| Day 4 | 1.05 |
| Day 5 | 1.04 |
| Day 6 | 1.02 |
| Day 7 | 1.01 |
| Day 8 | 1.01 |
| Day 9 | 1.00 |
| Day 10 | 1.00 |
| Day 11 | 0.99 |
| Day 12 | 0.99 |
| Day 13 | 0.99 |
| Day 14 | 0.99 |
| Day 15 | 0.98 |
| Day 16 | 0.97 |
| Day 17 | 0.97 |
| Day 18 | 0.96 |
| Day 19 | 0.95 |
| Day 20 | 0.95 |
| Day 21 | 0.95 |
| Over 21 | 0.92 |

\*The adjustment for day 1 would be 1.31 or 1.19 depending on whether the IPF has a qualifying emergency department or is a psychiatric unit in an acute care hospital or CAH with a qualifying emergency department (see §190.6.4).

## 190.6 - Facility-Level Adjustments
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

Facility-level adjustments include the hospital wage index, a rural location adjustment, a teaching status adjustment, an emergency department adjustment for qualifying EDs, and a cost-of-living adjustment for IPFs located in Alaska and Hawaii.

## 190.6.1 - Wage Index

(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)

The wage index accounts for the geographic differences in labor costs. The IPF PPS uses the unadjusted, pre-floor, pre-reclassified hospital wage index in effect on July 1 of each year. The wage index is applied to the labor-related share of the Federal per diem base rate.

Core-Based Statistical Area (CBSA) designations are used for assigning a wage index value for discharges occurring on or after July 1, 2006. Updates to the IPF PPS wage index are made in a budget neutral manner. CMS calculates a budget-neutral wage index adjustment factor by comparing estimated payments under the previous wage index to estimated payments under the updated wage index. This factor is applied in the update to the Federal per diem base rate.

## 190.6.2 - Rural Location Adjustment
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

There is a 17 percent adjustment if a facility is located in a rural area. The IPF PPS defines urban and rural areas at 42 CFR 412.402.

## 190.6.3 - Teaching Status Adjustment
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

IPFs that train interns and residents receive a facility-level adjustment to the Federal per diem base rate. The cost of direct graduate medical education (DGME) and nursing and allied health education are not paid through the IPF PPS.

PRICER calculates the adjustment by adding 1 to the ratio of interns and residents to the average daily census (ADC), and then raising that sum to the 0.5150 power.

The number of interns and residents is capped at the level indicated on the latest cost report submitted by the IPF prior to November 15, 2004. (See §190.6.3.1 for more detailed instructions for the FTE Resident Cap).

For beneficiaries enrolled in a Medicare Advantage plan, IPFs may bill for DGME and nursing and allied health education costs. There is no authority to pay teaching status adjustment to IPFs for Medicare Advantage beneficiaries, as is done under the IPPS.

## 190.6.3.1 - Full-Time Equivalent (FTE) Resident Cap
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

There is a cap on the number of FTE residents that may be counted for purposes of calculating the teaching adjustment. There is no limit to the number of residents teaching institutions can hire or train. There is only a limit to the number of residents who may be counted in calculation of the IPF PPS teaching adjustment. The cap is the number of FTE residents that trained in the IPF during a base year.

- Medicare provider number ranges for IPFs are from xx-4000 - xx-4499, xx-Sxxx, and xx-Mxxx; (NOTE: Implementation of NPI will change this.)

- The IPF must correctly code diagnoses for the principal diagnosis, and up to twenty four additional diagnoses, if applicable;

- The IPF must correctly code one principal procedure and up to twenty four additional procedures performed during the stay;

- The IPF must also code age, sex, and patient (discharge) status of the patient on the claim, using standard inpatient coding rules; and

- An IPF distinct part must code source of admission code "D" on incoming transfers from the acute care area of the same hospital to avoid overpayment of the emergency department adjustment when the acute area has billed or will be billing for covered services for the same inpatient admission.

Other general requirements for processing Medicare Part A inpatient claims described in Chapter 25 of this manual apply.

CMS' hospital inpatient GROUPER applicable to the discharge date (or effective December 3, 2007, benefits exhaust date, if present) on the claim will determine the DRG/MS-DRG assignment.

## 190.10.2 - Billing Period

(Rev. 1231; Issued: 04-27-07; Effective: 12-03-07; Implementation: 12-03-07)
When the patient has Medicare benefits, IPF providers will submit one admit through discharge claim for the stay upon discharge. IPFs may submit interim bill in 60-day intervals following the instructions in chapter 1, §50.2 of this manual should the patient's stay be exceptionally long. Final PPS payment is based upon the date of physical discharge or death, or the date benefits exhausted (effective December 3, 2007).

IPFs can submit adjustment claims, but late charge claims will not be allowed, e.g., the adjustment claim must include all charges and services and must replace the earlier claim(s) instead of including only the additional charges and services.

In situations when a patient falls below a skilled level of care, IPFs should submit a 112 TOB with both an Occurrence Code 22 (Date active care ended) and patient status code 30 (Still a patient). IPFs should then continue to submit subsequent interim 117 TOBs, as appropriate, with the patient status code 30 and the correct Occurrence Span Codes that identify payment liability (codes 76 or 77).

Effective December 3, 2007, once the patient's Medicare benefit's exhaust, the IPF is allowed to submit no-pay bills (TOB 110), with a Patient Status Code of 30 every 60 days, until the patient is physically discharged or dies. The last bill shall contain a discharge

patient status code. IPFs no longer need to continually adjust claims once benefits exhaust.

## 190.10.3 - Patient Status Coding
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

All patient status (i.e., discharge disposition) codes for 11X TOB are valid, but there are no special payment policies related to transfer codes; for example, discounted or per diem payments in transfer situations. The same patient status codes applicable under inpatient PPS for same day transfers (with Condition Code 40) are applicable under IPF PPS.

## 190.10.4 - Reporting ECT Treatments
**(Rev. 3030, Issued: 08-22-14, Effective: ASC X12: January 1, 2012, ICD-10: Upon Implementation of ICD -10, Implementation: ICD -10: Upon Implementation of ICD -10, ASC X12: September, 23 2014)**

IPFs must report on their claims under Revenue Code 0901, along with the total number of ECT treatments provided to the patient during their IPF stay listed under "Service Units." Providers will code ICD-9-CM procedure code 94.27 if ICD-9-CM is applicable, or, effective with the implementation of ICD-10, the ICD-10-PCS codes listed below are reported in the procedure code field, and for the procedure date will use the date of the last ECT treatment the patient received during their IPF stay.

### ICD-10-PCS Code and Description

GZB0ZZZ - Electroconvulsive Therapy, Unilateral-Single Seizure
GZB1ZZZ - Electroconvulsive Therapy, Unilateral-Multiple Seizure
GZB2ZZZ - Electroconvulsive Therapy, Bilateral-Single Seizure
GZB3ZZZ - Electroconvulsive Therapy, Bilateral-Muliple Seizure
GZB4ZZZ - Other Electroconvulsive Therapy

## 190.10.5 - Outpatient Services Treated as Inpatient Services
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

IPFs are subject to the 1-day payment window for outpatient bundling rules. Refer to chapter 3, §40.3 of this manual for more information on bundling rules.

## 190.10.6 - Patient is a Member of a Medicare Advantage Organization for Only a Portion of a Billing Period
**(Rev. 1101, Issued: 11-03-06, Effective: 01-01-05, Implementation: 12-04-06)**

The payer at the time of the patient's admission to an IPF is responsible for the cost of the entire stay. This could occur for patients who move from traditional Medicare to a Medicare Advantage plan or vice versa.

JS 44 (Rev. 07/16)

FILED IN CAMERA AND UNDER SEAL

## CIVIL COVER SHEET

FILED 27 OCT '16 15:28 USDC-ORP

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

| I. (a) PLAINTIFFS | DEFENDANTS 3'16-CV-2065-YY |
|---|---|
| United States of America ex rel Carrie Eborall | Universal Health Services, Inc. |

**(b)** County of Residence of First Listed Plaintiff _____
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant **Multnomah**
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

Brian Mahany, 8112 W. Bluemound Rd, Suite 101, Wauwatosa, WI 53213

Attorneys *(If Known)*

### II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☒ 1 U.S. Government Plaintiff

☐ 2 U.S. Government Defendant

☐ 3 Federal Question *(U.S. Government Not a Party)*

☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)*

### III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

### IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☒ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product     Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |    Liability    ☐ 367 Health Care/ | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &     Pharmaceutical     Slander     Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'     Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) |    Liability    ☐ 368 Asbestos Personal    ☐ 340 Marine     Injury Product | | ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 345 Marine Product     Liability    **PERSONAL PROPERTY** ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | **LABOR** ☐ 710 Fair Labor Standards Act | **SOCIAL SECURITY** ☐ 861 HIA (1395ff) ☐ 862 Black Lung (923) | ☐ 480 Consumer Credit ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending | ☐ 720 Labor/Management Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ Exchange |
| ☐ 190 Other Contract |    Product Liability    ☐ 380 Other Personal | ☐ 740 Railway Labor Act | ☐ 864 SSID Title XVI | ☐ 890 Other Statutory Actions |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal     Property Damage | ☐ 751 Family and Medical | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts |
| ☐ 196 Franchise |    Injury    ☐ 385 Property Damage    ☐ 362 Personal Injury -     Product Liability |     Leave Act | | ☐ 893 Environmental Matters |
| |     Medical Malpractice | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information Act |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 791 Employee Retirement     Income Security Act | **FEDERAL TAX SUITS** | ☐ 896 Arbitration |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights    **Habeas Corpus:** | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 899 Administrative Procedure Act/Review or Appeal of |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | | ☐ 871 IRS—Third Party |     Agency Decision |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | |     26 USC 7609 | ☐ 950 Constitutionality of |
| ☐ 240 Torts to Land | ☐ 443 Housing/     Sentence | | |     State Statutes |
| ☐ 245 Tort Product Liability |     Accommodations    ☐ 530 General | | | |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty     Employment    **Other:** | **IMMIGRATION** | | |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other     Other    ☐ 550 Civil Rights | ☐ 462 Naturalization Application ☐ 465 Other Immigration Actions | | |
| | ☐ 448 Education    ☐ 555 Prison Condition    ☐ 560 Civil Detainee -     Conditions of     Confinement | | | |

### V. ORIGIN *(Place an "X" in One Box Only)*

☐ 1 Original Proceeding

☐ 2 Removed from State Court

☐ 3 Remanded from Appellate Court

☐ 4 Reinstated or Reopened

☐ 5 Transferred from Another District *(specify)*

☐ 6 Multidistrict Litigation - Transfer

☐ 8 Multidistrict Litigation - Direct File

### VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
31 USC 3729

Brief description of cause:
Fraudulent Medicare and TRICARE billing

| VII. REQUESTED IN COMPLAINT: | ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P. | DEMAND $ | CHECK YES only if demanded in complaint: JURY DEMAND: ☒ Yes ☐ No |
|---|---|---|---|

### VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____    DOCKET NUMBER _____

| DATE | SIGNATURE OF ATTORNEY OF RECORD |
|---|---|
| 10/21/2016 | Brian H. Mahany |

**FOR OFFICE USE ONLY**

RECEIPT # _____ AMOUNT _____ APPLYING IFP _____ JUDGE _____ MAG. JUDGE _____

**Russell D. Garrett**, OSB # 882111
E-mail: russ.garrett@jordanramis.com
**Roger A. Lenneberg**, OSB # 842733
E-mail: roger.lenneberg@jordanramis.com
JORDAN RAMIS PC
Attorneys at Law
Two Centerpointe Dr 6th Flr
Lake Oswego OR 97035
Telephone: (503) 598-7070
        Attorneys for Plaintiff Carrie Eborall

FILED 27 OCT '16 15:27 USDC-ORP

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel. CARRIE EBORALL**, <br><br> Plaintiffs, <br><br> v. <br><br> **UNIVERSAL HEALTH SERVICES, INC.; CEDAR HILLS HOSPITAL; and UBH OF OREGON, LLC**, <br><br> Defendants. | Case No. *3:16-CV-2065-YY* <br><br> **PLAINTIFFS' MOTION TO FILE UNDER SEAL** <br><br> **[FILED IN CAMERA AND UNDER SEAL]** |

Pursuant to LR 3-6(1) and 31 U.S.C. §3730(b), plaintiff moves for an order sealing this

proceeding.

/////

/////

/////

Page 1 – PLAINTIFF'S MOTION TO FILE
UNDER SEAL

53518-75290 *2431092_1\RMH 10/27 2016*

This motion is supported by the *Memorandum in Support of Plaintiff's Motion to File Under Seal* filed herewith.

Dated this 27th day of October, 2016.

**JORDAN RAMIS PC**

By:

**RUSSELL D. GARRETT, OSB** # 882111
russ.garrett@jordanramis.com
**ROGER A. LENNEBERG**, OSB # 842733
roger.lenneberg@jordanramis.com
Two Centerpointe Dr 6th Flr
Lake Oswego OR 97035
Telephone: (503) 598-7070
    Attorney(s) for Plaintiff Carrie Eborall

**Brian H. Mahany**, WI Bar # 1065623
E-mail: brian@mahanylaw.com
MAHANY LAW
8112 West Bluemound Rd, Ste 101
Wausatosa WI 53213
Telephone: (414) 258-2375
    *Anticipated Pro Hac Vice* Attorneys for
    Plaintiff Carrie Eborall

**Russell D. Garrett**, OSB # 882111
E-mail: russ.garrett@jordanramis.com
**Roger A. Lenneberg**, OSB # 842733
E-mail: roger.lenneberg@jordanramis.com
JORDAN RAMIS PC
Attorneys at Law
Two Centerpointe Dr 6th Flr
Lake Oswego OR 97035
Telephone: (503) 598-7070
     Attorneys for Plaintiff Carrie Eborall

FILED 27 OCT '16 15:27 USDC-ORP

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## PORTLAND DIVISION

| | |
|---|---|
| **UNITED STATES OF AMERICA, ex rel. CARRIE EBORALL**,<br><br>Plaintiffs,<br><br>v.<br><br>**UNIVERSAL HEALTH SERVICES, INC.; CEDAR HILLS HOSPITAL; and UBH OF OREGON, LLC**,<br><br>Defendants. | Case No. 3 : 16-CV-2065-YY<br><br>**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION TO FILE UNDER SEAL**<br><br>**[FILED IN CAMERA AND UNDER SEAL]** |

LR 3-6 provides in pertinent part:

     (a) At the time a complaint is presented for filing, any party

seeking to file the case under seal must either:

     (1) File a motion and supporting memorandum requesting the

Court to seal the case. Pending the Court's ruling on the motion to

Page 1 - MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION TO FILE UNDER SEAL

53518-75290 *2431095_1\RMH/10/27 2016*

seal, the case, complaint, and motion will be withheld from the

public record(.)

This is a *Qui Tam* proceeding brought under 31 U.S.C. §3729, *et. seq.* A *Qui Tam*

complaint must be filed under seal. 31 U.S.C. §3730(b)(2) provides in pertinent part: "The

complaint *shall be filed in camera, shall remain under seal for at least 60 days*, and shall not be

served on the defendant until the court so orders. The Government may elect to intervene and

proceed with the action within 60 days after it receives both the complaint and the material

evidence and information." (Emphasis added.)

Dated this 27th day of October, 2016.

**JORDAN RAMIS PC**

By: _____

**RUSSELL D. GARRETT,** OSB # 882111
russ.garrett@jordanramis.com
**ROGER A. LENNEBERG**, OSB # 842733
roger.lenneberg@jordanramis.com
Two Centerpointe Dr 6th Flr
Lake Oswego OR 97035
Telephone: (503) 598-7070
        Attorney(s) for Plaintiff Carrie Eborall

**Brian H. Mahany**, WI Bar # 1065623
E-mail: brian@mahanylaw.com
MAHANY LAW
8112 West Bluemound Rd, Ste 101
Wausatosa WI 53213
Telephone: (414) 258-2375
        *Anticipated Pro Hac Vice* Attorneys for
        Plaintiff Carrie Eborall

Page 2 - MEMORANDUM IN SUPPORT OF PLAINTIFFS'
MOTION TO FILE UNDER SEAL                53518-75290 *2431095_1 RMH 10/27/2016*

## UNITED STATES DISTRICT COURT

### DISTRICT OF OREGON

**UNITED STATES OF AMERICA, et al.**          Case No.: 3:16–cv–02065–YY
                                              *SEALED*

**Plaintiff(s),**

**v.**

**UNIVERSAL HEALTH SERVICES, INC., et al.**

**Defendant(s).**

_____ /

### Civil Case Assignment Order

1.    **Presiding Judge:** The above referenced case has been filed in the Portland Division of the U.S. District Court for the District of Oregon and assigned to:

> Presiding Judge . . . . . . . . . . . . . . . . . . . . . . . . . Hon. Youlee Yim You
>
> Presiding Judge's Suffix Code* . . . . . . . . . . . . . . . . . . . . . . . . . . . YY
>
> ***These letters must follow the case number on all future filings.**

2.    **Courtroom Deputy Clerk:** Questions about the status or scheduling of this case should be directed to:

> Trish Hunt
> Telephone:  503–326–8057
> Email:  trish_hunt@ord.uscourts.gov

3.    **Case Administrator/Docket Clerk:** Questions about filings or docket entries in this case should be directed to:

> Telephone:  503–326–8050

4.    **Place of Filing:** Any paper filings must be submitted to the Clerk of Court, Mark O. Hatfield U.S. Courthouse, 1000 S.W. Third Ave., Portland, OR, 97204. (*See* LR 3–1, LR 5–5.)

5.    **District Court Website:** Information about local rules of practice, CM/ECF electronic filing requirements, responsibility to redact personal identifiers from filings, and other related information can be found on the Court's website at ord.uscourts.gov.

6.    **Jurisdictional Authority of Magistrate Judges:**

     a.    **Pretrial Administration:** Pursuant to LR 72, the assigned United States Magistrate Judge is authorized to conduct all pretrial proceedings contemplated by 28 U.S.C. § 636(b) and Fed. R. Civ. P. 72 without further designation of the Court.

    b.    **Trial by Consent and Appeal Options:** Pursuant to LR 73, 28 U.S.C. § 636(c), and Fed. R. Civ. P. 73, all United States Magistrate Judges in this district are certified to exercise civil jurisdiction in assigned cases and, with the consent of the parties, enter final orders on dispositive motions, conduct trial, and enter final judgment which may be appealed directly to the Ninth Circuit Court of Appeals (instead of a district judge).

    Parties are encouraged to consent to the jurisdiction of a Magistrate Judge by signing and filing the (attached) Consent to Jurisdiction by a United States Magistrate Judge and Designation of the Normal Appeal Route. (*See* LR 5−5(c).) There will be no adverse consequences if a party elects not to consent to a Magistrate Judge. A Magistrate Judge, however, may be able to resolve a case earlier as they are primarily assigned only to civil cases.

    Additional information about United States Magistrate Judges in the District of Oregon is available on the Court's website.

**DATED:  October 27, 2016**                     **MARY L. MORAN**
                                                 **Clerk of Court**

                                        by:  /s/ C. Brost_____
                                             C. Brost, Deputy Clerk

# UNITED STATES DISTRICT COURT

# DISTRICT OF OREGON

**UNITED STATES OF AMERICA, et al.**

**Plaintiff(s),**

v.

**UNIVERSAL HEALTH SERVICES, INC., et al.**

**Defendant(s).**

_____ /

Case No.: 3:16–cv–02065–YY
*SEALED*

## Discovery and Pretrial Scheduling Order

To facilitate discovery and the effective management of this case, the Court orders that:

1. **Discovery and Pretrial Deadlines:** Unless otherwise ordered by the Court, the parties shall,

   a. within 120 days of this Order:
      i. File all pleadings pursuant to Fed. R. Civ. P. 7(a) and 15;
      ii. Join all claims, remedies, and parties pursuant to Fed. R. Civ. P. 18 and 19;
      iii. File all pretrial, discovery, and dispositive motions;
      iv. Complete all discovery; and
      v. Confer as to Alternate Dispute Resolution pursuant to LR 16–4(c).

   b. within 150 days of this Order:
      i. File a Joint ADR Report pursuant to LR 16–4(d); and
      ii. File a Proposed Pretrial Order pursuant to LR 16–5.

2. **Corporate Disclosure Statement:** In accordance with Fed. R. Civ. P. 7.1 and LR 7.1–1, any non–governmental corporate party must file a corporate disclosure statement concurrently with its first appearance (*See also* LR 83–9).

3. **Initial Conference of Counsel for Discovery Planning:**

   a. Except in cases exempted under Fed. R. Civ. P. 26(a)(1)(B), upon learning the identity of counsel for Defendant(s), counsel for the Plaintiff(s) must initiate communications with counsel for Defendant(s).

   b. All counsel must then confer as required by Fed. R. Civ. P. 26(f) within thirty (30) days after a defendant files a responsive pleading or a motion under Fed. R. Civ. P. 12. (*See* LR 26–1.)

   c. Counsel should also discuss their client's positions regarding:

      i. Consent to a Magistrate Judge; and
      ii. Alternate Dispute Resolution options. ADR options include judicial settlement conferences or Court–sponsored mediation with highly qualified lawyer–mediators. Court–sponsored mediators agree to conduct mediation without cost to the Court or parties for four (4) hours, exclusive

of preparation and travel time to and from the agreed location for mediation. Parties are encouraged to visit the Court's website for additional ADR information, including mediator biographies, subject–matter expertise, and contact information.

      d.    If counsel for all of the parties agree to forgo the initial disclosures required by Fed. R. Civ. P. 26(a)(1), they shall file with the Court the Fed. R. Civ. P. 26(a) Discovery Agreement form issued with this order (*See* LR 26–2). Whether or not the parties agree to forgo the initial disclosures, they may seek discovery once the initial conference of counsel for discovery planning contemplated by Fed. R. Civ. P. 26(f) has occurred. (*See* LR 26–1.)

**4.**    **Rule 16 Court Conference for Scheduling and Planning:** Counsel for Plaintiff(s) and for Defendant(s) must, during or promptly after the conference of counsel referred to in section 3 above, contact the assigned judge's courtroom deputy clerk to schedule a Rule 16 Conference for scheduling and planning. (*See* LR 16–2.)

At the Rule 16 Conference, the parties must be prepared to discuss discovery, whether there is consent to a Magistrate Judge, and any scheduling or other issues, including any requested modifications to the initial scheduling order set forth in section 1 above, and possible submission of trial exhibits electronically (*See* LR 5–6(b)).

**5.**    **Service of this Order:** Counsel for the Plaintiff (the "filing party") must serve this order and all attachments upon all other parties to the action. (In cases removed to this Court, the removing defendant is considered the "filing party.") (*See* LR 3–5.) A *pro se* filing party is required to serve this order and all attachments upon all other parties to the action.

**DATED:  October 27, 2016**                    **MARY L. MORAN**
                                                **Clerk of Court**

                                     by:  /s/ C. Brost
                                            C. Brost, Deputy Clerk

# UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

**UNITED STATES OF AMERICA, et al.**                    **Case No.: 3:16−cv−02065−YY**
                                                        **\*SEALED\***

**Plaintiff(s),**

**v.**

**UNIVERSAL HEALTH SERVICES, INC., et al.**

**Defendant(s).**

_____  /

### Fed. R. Civ. P. 26(a)(1) Discovery Agreement

Pursuant to LR 26−2, I state that the parties who have been served and who are not in default have agreed to forgo the disclosures required by Fed. R. Civ. P. 26(a)(1).

**DATED:** _____

|  |  |
|---|---|
| **Signature:** | _____ |
| **Name and OSB ID:** | _____ |
| **E−mail Address:** | _____ |
| **Firm Name:** | _____ |
| **Mailing Address:** | _____ |
| **City, State, Zip:** | _____ |
| **Parties Represented:** | _____ |

cc: Counsel of Record

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

UNITED STATES OF AMERICA, et al.       Case No.: 3:16–cv–02065–YY
                                       *SEALED*

Plaintiff(s),

v.

UNIVERSAL HEALTH SERVICES, INC., et al.

Defendant(s).

_____ /

### Consent to Jurisdiction by a Magistrate Judge
### and Designation of the Normal Appeal Route

     Pursuant to Fed. R. Civ. P 73(b), as counsel for the party (parties) identified below, I consent to have a United States Magistrate Judge conduct any and all proceedings in this case, including entry of orders on dispositive motions, trial, and entry of final judgment. I understand that withholding consent will not result in any adverse consequences. Pursuant to Fed. R. Civ. P. 73(c), I agree that an appeal from a judgment entered at a Magistrate Judge's direction may be taken to the court of appeals as would any other appeal from a district court judgment.

**DATED:** _____

Signature: _____

Name and OSB ID: _____

E–mail Address: _____

Firm Name: _____

Mailing Address: _____

City, State, Zip: _____

Parties Represented: _____

cc: Counsel of Record

**U.S. District Court – Oregon**
**Civil Case Management Time Schedules**

| Local Rule | Event or Requirement | Time Frame | Comment |
|---|---|---|---|
| LR 16–1(d) | Discovery and Pretrial Scheduling Order (with attachments) | Issued by the Clerk's Office at new civil case initiation, along with the summonses | Required to be served on all parties by the filing party (*See* LR 3–5) |
| LR 26–1 | Initial Conference for Discovery Planning | Within 30 days of a defendant filing a responsive pleading or a motion under Fed. R. Civ. P. 12 | Held between the parties |
| LR 16–2 | Rule 16 Conference | Scheduled by the assigned judge after the required LR 26–1 initial discovery planning conference | Affirmative duty on all counsel to contact the assigned judge's courtroom deputy (*See* LR 16–2(a)) |
| LR 16–4(c) | ADR Conference Requirements | Within 120 days from the date the Discovery and Pretrial Scheduling Order is issued | Parties must confer with other attorneys and unrepresented parties to discuss ADR options |
| | Joint Status Report | Within 120 days from the date the Discovery and Pretrial Scheduling Order is issued | Required in cases assigned to Judge Jones |
| LR 16–2(e) | Completion of Discovery | Unless otherwise ordered by the Court, within 120 days from the date the Discovery and Pretrial Scheduling Order is issued | Discovery deadlines are set forth in the Discovery and Pretrial Scheduling Order |
| LR 16–4(d) | Joint ADR Report | Within 150 days from the date the Discovery and Pretrial Scheduling Order is issued | The parties must file a Joint ADR Report |
| LR 16–5 | Joint Proposed Pretrial Order | Unless otherwise modified pursuant to LR 16–5(a), within 150 days from the date the Discovery and Pretrial Scheduling Order is issued | The Joint Proposed Pretrial Order filing deadline is established in the Discovery and Pretrial Scheduling Order |
| LR 16–4(f)(2)(B) | Notice to the Court that the Parties Are Unable to Select a Court–sponsored Mediator from the Court's list of mediators | Within fourteen (14) days after entry of a court order referring a case for Court–sponsored mediation | Plaintiff's attorney (or the *pro se* plaintiff) is responsible for notifying the assigned judge who will then designate a mediator |
| LR 16–4(h)(1) | Notification of Private ADR Results | Not later than seven (7) days after the conclusion of private ADR proceedings | Plaintiff's attorney (or the *pro se* plaintiff) is responsible for notifying the court |
| LR 16–4(h)(2) | Report of Court–sponsored Mediator | Not later than seven (7) days following the conclusion of the mediation if no settlement is achieved | Court–sponsored mediator is responsible for notifying the court |

RECVD 27 OCT '16 15:30 USDC-ORP

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

United States of America ex rel Carrie Eborall

_____
Plaintiff(s),

v.

Universal Health Services, Inc., et al

_____
Defendant(s).

Civil Case No. 3:16-W-2065-YY

APPLICATION FOR SPECIAL
ADMISSION – _PRO HAC VICE_

**[FILED IN CAMERA AND
UNDER SEAL]**

Attorney   Brian H. Mahany   _____ requests special admission _pro hac vice_ in
the above-captioned case.

**Certification of Attorney Seeking _Pro Hac Vice_ Admission:**   I have read and understand the
requirements of LR 83-3, and certify that the following information is correct:

(1)   **PERSONAL DATA:**

Name: Mahany _____ Brian _____ H. _____
        (Last Name)           (First Name)           (MI)        (Suffix)

Firm or Business Affiliation: Mahany Law

Mailing Address:   8112 West Bluemound Road, Suite 101

City: Wauwatosa _____ State: WI _____ Zip: 53213

Phone Number: 414-258-2375 _____ Fax Number: 414-777-0776

Business E-mail Address: brian@mahanylaw.com

69785

(2) **BAR ADMISSIONS INFORMATION:**

   (a)    State bar admission(s), date(s) of admission, and bar ID number(s):

          Please see attached list

   (b)    Other federal court admission(s), date(s) of admission, and bar ID number(s):

          Please see attached list

(3) **CERTIFICATION OF DISCIPLINARY ACTIONS:**

   (a)   ☑ I am not now, nor have I ever been subject to any disciplinary action by any state or federal bar association; or

   (b)   ☐ I am now or have been subject to disciplinary action from a state or federal bar association. (See attached letter of explanation.)

(4) **CERTIFICATION OF PROFESSIONAL LIABILITY INSURANCE:**

Per LR 83-3(a)(3), I have professional liability insurance, or financial responsibility equivalent to liability insurance, that meets the insurance requirements of the Oregon State Bar for attorneys practicing in this District, and that will apply and remain in force for the duration of the case, including any appeal proceedings.

(5) **REPRESENTATION STATEMENT:**

I am representing the following party(s) in this case:

Relator Carrie Eborall

(6)     **CM/ECF REGISTRATION:**

Concurrent with approval of this *pro hac vice* application, I acknowledge that I will become a registered user of the Court's Case Management/Electronic Case File system. (*See* the Court's website at ord.uscourts.gov), and I consent to electronic service pursuant to Fed. R. Civ. P 5(b)(2)(E) and the Local Rules of the District of Oregon.

**DATED** this 26 ___ day of October ___, 2016 ___

_____
*(Signature of Pro Hac Counsel)*

Brian H. Mahany
*(Typed Name)*

---

**CERTIFICATION OF ASSOCIATED LOCAL COUNSEL:**

I certify that I am a member in good standing of the bar of this Court, that I have read and understand the requirements of LR 83-3, and that I will serve as designated local counsel in this particular case.

**DATED** this 26 ___ day of October ___, 2016 ___

_____
*(Signature of Local Counsel)*

Name: Garrett                    Russell                          D
      *(Last Name)*             *(First Name)*                    *(MI)*          *(Suffix)*

Oregon State Bar Number: 882111

Firm or Business Affiliation: Jordan Ramis PC

Mailing Address: 2 Centerpointe Drive, 6th Floor

City: Lake Oswego          State: OR          Zip: 97035

Phone Number: 360-567-3911          Business E-mail Address: russ.garrett@jordanramis.co

---

**COURT ACTION**

☐ Application approved subject to payment of fees.
☐ Application denied.

**DATED** this _____ day of _____, _____

_____
Judge

---

U.S. District Court–Oregon                    Application for Special Admission – *Pro Hac Vice*
Revised March 28, 2016                         Page 3 of 3

The following list is in response to the bar admissions information required in the Motion for Admission *Pro Hac Vice*.

Brian H. Mahany is admitted in the following Courts:

**State Courts:**

Wisconsin – Admitted April 3, 2009 (No. 1065623)

Maine – Admitted March 20, 1985 (No. 003269)


**U.S. Courts:**

Eastern District of WI – Admitted January 30, 2008 (No. 1065623)

Western District of WI – Admitted December 23, 2011 (No. 1065623)

Eastern District of TX – Admitted November 4, 2013 (No. 1065623)

Eastern District of MI – Admitted August 6, 2015

Northern District of IN – Admitted October 10, 2007

Northern District of IL – Admitted February 7, 2012

United States Court of Appeals for the Armed Forces – Admitted August 29, 1986

United States Tax Court – July 8, 1986

RECVD 27 OCT '16 1530 USDC-ORP

# UNITED STATES DISTRICT COURT
## DISTRICT OF OREGON

United States of America ex rel Carrie Eborall

_____
**Plaintiff(s),**

v.

Universal Health Services, Inc., et al

_____
**Defendant(s).**

Civil Case No. 3:16-W-2065-YY

APPLICATION FOR SPECIAL
ADMISSION – *PRO HAC VICE*

[FILED IN CAMERA AND
UNDER SEAL]

Attorney  Brian H. Mahany  _____ requests special admission *pro hac vice* in the above-captioned case.

**Certification of Attorney Seeking *Pro Hac Vice* Admission:**  I have read and understand the requirements of LR 83-3, and certify that the following information is correct:

(1)  **PERSONAL DATA:**

Name: Mahany               Brian            H.
        *(Last Name)*          *(First Name)*      *(MI)*      *(Suffix)*

Firm or Business Affiliation: Mahany Law

Mailing Address:        8112 West Bluemound Road, Suite 101

City: Wauwatosa                     State: WI              Zip: 53213

Phone Number: 414-258-2375              Fax Number: 414-777-0776

Business E-mail Address: brian@mahanylaw.com

69785

(2) **BAR ADMISSIONS INFORMATION:**

    (a)    State bar admission(s), date(s) of admission, and bar ID number(s):
    Please see attached list

    (b)    Other federal court admission(s), date(s) of admission, and bar ID number(s):
    Please see attached list

(3) **CERTIFICATION OF DISCIPLINARY ACTIONS:**

    (a)  ☑ I am not now, nor have I ever been subject to any disciplinary action by any state or federal bar association; or

    (b)  ☐ I am now or have been subject to disciplinary action from a state or federal bar association. (See attached letter of explanation.)

(4) **CERTIFICATION OF PROFESSIONAL LIABILITY INSURANCE:**

Per LR 83-3(a)(3), I have professional liability insurance, or financial responsibility equivalent to liability insurance, that meets the insurance requirements of the Oregon State Bar for attorneys practicing in this District, and that will apply and remain in force for the duration of the case, including any appeal proceedings.

(5) **REPRESENTATION STATEMENT:**

I am representing the following party(s) in this case:

Relator Carrie Eborall

(6)   **CM/ECF REGISTRATION:**

Concurrent with approval of this *pro hac vice* application, I acknowledge that I will become a registered user of the Court's Case Management/Electronic Case File system. (*See* the Court's website at ord.uscourts.gov), and I consent to electronic service pursuant to Fed. R. Civ. P 5(b)(2)(E) and the Local Rules of the District of Oregon.

DATED this 26 day of October , 2016

_____
*(Signature of Pro Hac Counsel)*

Brian H. Mahany
*(Typed Name)*

---

**CERTIFICATION OF ASSOCIATED LOCAL COUNSEL:**

I certify that I am a member in good standing of the bar of this Court, that I have read and understand the requirements of LR 83-3, and that I will serve as designated local counsel in this particular case.

DATED this 26 day of October , 2016

_____
*(Signature of Local Counsel)*

Name:  Garrett                    Russell                    D
        *(Last Name)*              *(First Name)*            *(MI)*        *(Suffix)*

Oregon State Bar Number: 882111

Firm or Business Affiliation: Jordan Ramis PC

Mailing Address: 2 Centerpointe Drive, 6th Floor

City: Lake Oswego                     State: OR          Zip: 97035

Phone Number: 360-567-3911          Business E-mail Address: russ.garrett@jordanramis.co

---

**COURT ACTION**

☒ Application approved subject to payment of fees.
☐ Application denied.

DATED this 1 day of November , 2016

/s/ Youlee Yim You
Judge

---

The following list is in response to the bar admissions information required in the Motion for Admission *Pro Hac Vice*.

Brian H. Mahany is admitted in the following Courts:

**State Courts:**

Wisconsin – Admitted April 3, 2009 (No. 1065623)

Maine – Admitted March 20, 1985 (No. 003269)


**U.S. Courts:**

Eastern District of WI – Admitted January 30, 2008 (No. 1065623)

Western District of WI – Admitted December 23, 2011 (No. 1065623)

Eastern District of TX – Admitted November 4, 2013 (No. 1065623)

Eastern District of MI – Admitted August 6, 2015

Northern District of IN – Admitted October 10, 2007

Northern District of IL – Admitted February 7, 2012

United States Court of Appeals for the Armed Forces – Admitted August 29, 1986

United States Tax Court – July 8, 1986

```
MIME-Version:1.0
From:info@ord.uscourts.gov
To:nobody
Bcc:
--Case Participants:
--Non Case Participants:
--No Notice Sent:

Message-Id:5660245@ord.uscourts.gov
Subject:Activity in Case 16-2065 Sealed v. Sealed (Redacted Notice)
Content-Type: text/html
```

### U.S. District Court

### District of Oregon

**Notice of Electronic Filing**


The following transaction was entered on 11/1/2016 at 10:39 AM PDT and filed on 11/1/2016

| | |
|---|---|
| **Case Name:** | United States of America et al v. Universal Health Services, Inc. et al |
| **Case Number:** | 3:16–cv–02065–YY *SEALED* |
| **Filer:** | |
| **Document Number:** | 6(No document attached) |

**Docket Text:**
 **Notification of CM/ECF Account for Brian H. Mahany (*Pro Hac Vice* admission). Your login is: bhmahany. Go to <u>the CM/ECF login page</u> to set your password. (ecp)**


**3:16–cv–02065–YY *SEALED*** <span style="color:darkred">**No electronic public notice will be sent because the case/entry is sealed.**</span>

```
MIME-Version:1.0
From:info@ord.uscourts.gov
To:nobody
Bcc:
--Case Participants:
--Non Case Participants:
--No Notice Sent:

Message-Id:5662764@ord.uscourts.gov
Subject:Activity in Case 16-2065 Sealed v. Sealed (Redacted Notice)
Content-Type: text/html
```

**U.S. District Court**

**District of Oregon**

**Notice of Electronic Filing**

The following transaction was entered on 11/3/2016 at 10:27 AM PDT and filed on 11/3/2016

| | |
|---|---|
| **Case Name:** | United States of America et al v. Universal Health Services, Inc. et al |
| **Case Number:** | 3:16–cv–02065–YY *SEALED* |
| **Filer:** | |
| **Document Number:** | 7(No document attached) |

**Docket Text:**
 Clerk's Notice of Mailing regarding Notification of New CM/ECF Account, [6] emailed to attorney Brian Mahany. Order on Application for Special Admission Pro Hac Vice, [5] emailed to all parties. (ecp)


**3:16–cv–02065–YY *SEALED* No electronic public notice will be sent because the case/entry is sealed.**

```
MIME-Version:1.0
From:info@ord.uscourts.gov
To:nobody
Bcc:
--Case Participants:
--Non Case Participants:
--No Notice Sent:

Message-Id:5663870@ord.uscourts.gov
Subject:Activity in Case 16-2065 Sealed v. Sealed (Redacted Notice)
Content-Type: text/html
```

### U.S. District Court

### District of Oregon

**Notice of Electronic Filing**

The following transaction was entered on 11/4/2016 at 7:50 AM PDT and filed on 11/4/2016

| | |
|---|---|
| **Case Name:** | United States of America et al v. Universal Health Services, Inc. et al |
| **Case Number:** | 3:16–cv–02065–YY *SEALED* |
| **Filer:** | |
| **Document Number:** | 8(No document attached) |

**Docket Text:**
 **ORDER by Magistrate Judge Youlee Yim You: GRANTING Motion to Seal the Case (#[2]). (eo)**

**3:16–cv–02065–YY *SEALED*** No electronic public notice will be sent because the case/entry is sealed.

```
MIME-Version:1.0
From:info@ord.uscourts.gov
To:nobody
Bcc:
--Case Participants:
--Non Case Participants:
--No Notice Sent:

Message-Id:5663874@ord.uscourts.gov
Subject:Activity in Case 16-2065 Sealed v. Sealed (Redacted Notice)
Content-Type: text/html
```

### U.S. District Court

### District of Oregon

## Notice of Electronic Filing

The following transaction was entered on 11/4/2016 at 7:53 AM PDT and filed on 11/4/2016

| | |
|---|---|
| **Case Name:** | United States of America et al v. Universal Health Services, Inc. et al |
| **Case Number:** | 3:16−cv−02065−YY *SEALED* |
| **Filer:** | |
| **Document Number:** | 9(No document attached) |

**Docket Text:**
 **Clerk's Notice of E−Mail service: Notice of the order granting motion to seal case (#[8]) was e−mailed to plaintiff's counsel. (eo)**


**3:16−cv−02065−YY *SEALED*** **No electronic public notice will be sent because the case/entry is sealed.**

```
MIME-Version:1.0
From:info@ord.uscourts.gov
To:nobody
Bcc:
--Case Participants:
--Non Case Participants: Mary Anne Anderson (mary_anne_anderson@ord.uscourts.gov)
--No Notice Sent:

Message-Id:5720499@ord.uscourts.gov
Subject:Activity in Case 16-2065 Sealed v. Sealed (Redacted Notice)
```
Content–Type: text/html

### U.S. District Court

### District of Oregon

## Notice of Electronic Filing

The following transaction was entered on 1/10/2017 at 12:08 PM PST and filed on 1/10/2017

| | |
|---|---|
| **Case Name:** | United States of America et al v. Universal Health Services, Inc. et al |
| **Case Number:** | 3:16–cv–02065–YY *SEALED* |
| **Filer:** | |
| **Document Number:** | 12(No document attached) |

**Docket Text:**
 **Clerk's Notice of emailing to Alexis A. Lien regarding Exparte, Order on motion for extension of time, Order on Motion – Miscellaneous[11]. (pvh)**


**3:16–cv–02065–YY *SEALED*** No electronic public notice will be sent because the case/entry is sealed.

FILED 30 JUN '17 13:38 USDC-ORP

**BILLY J. WILLIAMS, OSB #901366**
United States Attorney
District of Oregon
**ALEXIS A. LIEN, OSB #110569**
alexis.lien@usdoj.gov
Assistant United States Attorney
United States Attorney's Office
District of Oregon
1000 S.W. Third Ave., Suite 600
Portland, Oregon 97204-2902
Telephone: (503) 727-1000

*Attorney for Plaintiff United States of America*

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

|  |  |
|---|---|
| UNITED STATES OF AMERICA, *ex rel.* CARRIE EBORALL, | Case No.: 3:16-cv-02065-YY |
| Plaintiff, | **UNITED STATES' UNOPPOSED *EX PARTE* MOTION TO TRANSFER VENUE** |
| v. | |
| UNIVERSAL HEALTH SERVICES, INC.; CEDAR HILLS HOSPITAL; and UBH OF OREGON, LLC, | **FILED UNDER SEAL** Pursuant to the False Claims Act, 31 U.S.C. §§ 3730(b)(2) AND (3)] |
| Defendants. | |

The United States respectfully applies to the Court to transfer this action to the United

States District Court for the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1404(a).

The transfer will enable the United States to consolidate this matter with other under seal *qui tam*

actions pending in that district that contain overlapping and/or related allegations against Universal

Health Services, Inc. and related entities. The United States also respectfully requests that, in its transfer order, the Court suggest to the transferee Court that this action be deemed related to *United States, et al. ex rel. Jain v. UHS, et al.*, Civil Action No. 13-6499 (E.D. Pa.), and be subject to such seal and intervention deadline orders as are in place in that related case.

Relator, through counsel, consents to the relief sought by this motion.

**MEMORANDUM IN SUPPORT OF UNITED STATES' UNOPPOSED
*EX PARTE* MOTION TO TRANSFER VENUE**

## I.     BACKGROUND

### A.     UHS Investigation

UHS is a hospital management company headquartered in King of Prussia, Pennsylvania. UHS is the corporate parent and, through its subsidiaries, owns and operates 225 facilities in 37 states and the District of Columbia.

The United States and certain states' Attorneys General have been investigating more than a dozen matters involving UHS and its facilities or related entities. The United States is currently investigating twelve pending *qui tam* complaints that have named UHS and its facilities or related entities as defendants. In addition to this Court, cases are pending in the United States District Courts for the Eastern District of Pennsylvania, the Middle District of Florida, and the Eastern District of Virginia. Cases filed in the Middle District of Georgia, the Northern District of Georgia, the District of Utah, the Southern District of Texas, and the Northern District of Illinois have already been transferred to the Eastern District of Pennsylvania; in total, there are currently nine pending under seal *qui tam* actions in that district. In addition to these *qui tam* complaints, the United States is conducting investigations into UHS facilities in Illinois, North Carolina, Virginia, Florida, and Pennsylvania. These *qui tam* actions and investigations contain related and/or overlapping allegations against UHS, as the corporate parent, and certain related entities or

**Page 2 -     United States' Unopposed *Ex Parte* Motion to Transfer Venue**

facilities, including the appropriateness of admissions, the quality of care, and billing for services not provided or not medically necessary.

In the interest of judicial economy, the United States seeks to consolidate the various UHS *qui tam* actions in the United States District Court for the Eastern District of Pennsylvania, the district in which UHS is headquartered. Two of the twelve *qui tam* actions were filed in the United States District Court for the Eastern District of Pennsylvania. In addition, seven other *qui tam* actions have already been transferred to the United States District Court for the Eastern District of Pennsylvania

### B. Relator's Allegations

Relator filed this *qui tam* action pursuant to the False Claims Act, 31 U.S.C. §§ 3729-3733. Relator initiated this action by serving a copy of the complaint and written disclosure of evidence on the United States on November 3, 2016.

Relator alleges that Defendants knowingly (1) presented or caused to be presented false claims for payment to the United States; and (2) made or caused to be made false statements to get those false claims paid. More specifically, Relator alleges that Defendants have violated the False Claims Act by fraudulently billing Medicare and other federal payors for inpatient psychiatric services, including hospital services that were not medically necessary in type, scope, and/or duration.

The United States continues to investigate this case in conjunction with the other *qui tam* actions and investigations. The allegations made by Relator overlap substantially with claims made in these other *qui tam* actions and investigations.

### II. ARGUMENT

For the reasons explained below, the Court should transfer this matter to the United States

---

**Page 3 -** **United States' Unopposed *Ex Parte* Motion to Transfer Venue**

District Court for the Eastern District of Pennsylvania.

A district court may, "[f]or the convenience of parties and witnesses, in the interest of justice, . . . transfer any civil action to any other district or division where it might have been brought[.]" 28 U.S.C. § 1404(a).

In deciding whether to transfer venue, courts consider the following factors:

> (1) the plaintiff's choice of forum, (2) the parties' contacts with the forum, (3) convenience to the parties, (4) convenience to the witnesses, (5) availability of compulsory process for non-party witnesses, (6) ease of access to evidence, (7) differences in the costs of litigation in the two forums, (8) familiarity of each forum with the applicable law, (9) local interest in the controversy, and (10) the relative court congestion and time of trial in each forum.

*Pulse Health LLC v. Akers Biosciences, Inc.*, No. 3:16-CV-01919-HZ, 2017 WL 1371272, at *17 (D. Or. Apr. 14, 2017) (quoting *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 498 (9th Cir. 2000)).

As a preliminary matter, this case could have been brought in the United States District Court for the Eastern District of Pennsylvania. Defendant UHS is headquartered there and transacts business within the district. A civil action under the False Claims Act may be brought "in any judicial district in which the defendant, or in the case of multiple defendants, any one defendant can be found, resides, [or] transacts business[.]" 31 U.S.C. § 3732(a).

Similarly, all of the following factors either weigh strongly in favor of transferring this case to the United States District Court for the Eastern District of Pennsylvania or are neutral.

**1)** *Plaintiffs' choice of forum.* In *qui tam* actions, the United States is the real party in interest. *See U.S. ex rel. Eisenstein v. City of N.Y., N.Y.,* 556 U.S. 928, 930 (2009) ("[T]he United States is a 'real party in interest' in a case brought under the [False Claims Act][.]") (citation omitted). "Generally, this factor is given great weight." *Beverage Mgmt. Sys., Inc. v. Ott,* No. 3:12-CV-2126-SI, 2013 WL 1296083, at *8 (D. Or. Mar. 26, 2013) (citing *Lou v. Belzberg*, 834

F.2d 730, 739 (9th Cir. 1987)). Accordingly, this factor strongly supports the United States'
request to transfer this matter. Additionally, Relator has consented to the requested transfer of
venue.

    **2)**     *Parties' contacts with the forum.*    Cedar Hills Hospital and UHB of Oregon, LLC
are subsidiaries of Defendant UHS, and UHS's headquarters is located in the Eastern District of
Pennsylvania. Accordingly, Defendants have strong contacts with the Eastern District of
Pennsylvania. At the very least, this factor is neutral. *See Eason v. Elmer's Rests., Inc.*, No.
3:15-CV-02335-SI, 2016 WL 1029482, at *4 (D. Or. Mar. 15, 2016) ("Because the parties have
contacts with both the forum and the state to which Karsan and Lewis seek to transfer the case, the
Court considers this factor neutral.").

    **3)**     *Convenience of the parties.*    The convenience of the parties supports transfer of
this matter. Defendant UHS's headquarters is located in the district to which the transfer is being
sought. Relator consents to the transfer. A transfer would enable the United States to further
coordinate its investigations of UHS by consolidating pending *qui tam* cases in one district. The
consolidation would reduce the burden on—and thereby serve the convenience of—all parties.

    **4)**     *Convenience of the witnesses.*    The convenience of the witnesses supports transfer
in the present case. The majority of UHS' corporate witnesses are located in the Eastern District
of Pennsylvania, where UHS is headquartered. The remaining witnesses, including facility
employees, are most likely located throughout the United States, including the 37 states where
UHS has facilities. Thus, because of the location of the corporate witnesses, on the whole this
factor supports transferring this matter to the United States District Court for the Eastern District
of Pennsylvania.

    **5)**     *Availability of compulsory process for non-party witnesses.*    This factor supports

**Page 5 -**    **United States' Unopposed *Ex Parte* Motion to Transfer Venue**

transfer because many of the corporate management witnesses are located in the Eastern District of Pennsylvania. Moreover, the False Claims Act provides nationwide service of process, 31 U.S.C. § 3731(a), meaning that witnesses outside of the Eastern District of Pennsylvania are also subject to the federal subpoena power.

**6)** ***Ease of access to evidence.*** This factor supports transfer because many of the relevant documents and other sources of proof—including many of the witnesses employed by Defendant UHS—are located in the Eastern District of Pennsylvania.

**7)** ***Differences in the costs of litigation.*** Transferring this matter to the Eastern District of Pennsylvania will reduce the costs of litigation. Specifically, the transfer will reduce the cost of transporting witnesses and records from UHS' headquarters. *See, e.g.*, *In re Choice Hotels, Inc. Sec. Litig.*, No. CIV. 07-CV-00734-REB, 2008 WL 793621, at *3 (D. Colo. Mar. 24, 2008) ("[T]he cost for transporting witnesses and records will be reduced, at least for the defendants, if this case is heard in Maryland. This factor weighs in favor of transfer."). A transfer would also help preserve UHS' resources by relocating this matter to UHS' home district and avoiding the costs of litigating in multiple forums. Moreover, a transfer would enable the United States to consolidate this matter with other *qui tam* matters pending in the Eastern District of Pennsylvania, streamlining its investigation and reducing the burden on, and cost to, all parties.

**8)** ***Forum's familiarity with governing law.*** This factor is neutral since both this Court and the United States District Court for the Eastern District of Pennsylvania are familiar with the statute at issue—the False Claims Act. In addition, as noted, nine other *qui tam* actions involving UHS and its facilities are already pending in the United States District Court for the Eastern District of Pennsylvania.

**9)** ***Local interest in the controversy.*** Because Defendant UHS is headquartered in

the Eastern District of Pennsylvania, and certain of the alleged facts originated from that district, this factor weighs in favor of transfer. *See, e.g., Holliday v. Lifestyle Lift, Inc.*, No. C 09-4995 RS, 2010 WL 3910143, at *8 (N.D. Cal. Oct. 5, 2010) ("Michigan has an interest insofar as [the defendant's] corporate headquarters is located within that State."). In addition, as noted, nine other *qui tam* actions involving UHS and its facilities are already pending in the United States District Court for the Eastern District of Pennsylvania.

  **10)**   ***Relative court congestion and time of trial.***   According to recent statistics, civil cases in the District of Oregon and the Eastern District of Pennsylvania move to trial at approximately the same speed (20.3 months in the Eastern District of Pennsylvania and 19.3 months in the District of Oregon).[1] *See Nike, Inc. v. Lombardi*, 732 F. Supp. 2d 1146, 1156, 1159 (D. Or. 2010) (observing that a difference in median time from the filing of the case to trial of 21.6 months compared to 28.1 months "show[s] about an equal timeline"). By other measures, the Eastern District of Pennsylvania is less congested than the District of Oregon. According to the most recent statistics, the median time from filing to disposition for civil cases is 5.5 months in the Eastern District of Pennsylvania and 10.3 months in Oregon; the number of pending cases per judge is 371 in the Eastern District of Pennsylvania and 517 in Oregon; and the number of weighted filings per judge is 310 in the Eastern District of Pennsylvania and 472 in Oregon.[2] This factor therefore weighs in favor of transfer.

  ***Other practical considerations.***   The United States is seeking a transfer of this case in

---

[1] *See* United States District Courts – National Judicial Caseload Profile, *available at* http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2016.pdf, at 16, 74.

[2] *See* United States District Courts – National Judicial Caseload Profile, *available at* http://www.uscourts.gov/sites/default/files/data_tables/fcms_na_distprofile1231.2016.pdf, at 16, 74.

**Page 7 -**   **United States' Unopposed *Ex Parte* Motion to Transfer Venue**

order to consolidate this case with nine other *qui tam* cases now pending in the United States District Court for the Eastern District of Pennsylvania. The United States intends to transfer all pending actions to that district as well. These cases all contain related or overlapping factual allegations and legal theories. Absent transfer and consolidation, multiple federal courts will handle cases with overlapping allegations and defendants, leading to potentially inconsistent judgments. "[T]he compelling public interest in avoiding duplicative proceedings (and potentially inconsistent judgments) warrants transfer of venue under these circumstances." *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 58 (D.D.C. 2000); *see also Cont'l Grain Co. v. The FBL-585*, 364 U.S. 19, 26 (1960) ("To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that s 1404(a) was designed to prevent.")

Overall, the weight of the factors support transferring this matter to the United States District Court for the Eastern District of Pennsylvania.

**CONCLUSION**

For the foregoing reasons, the United States respectfully requests that this action be transferred to the United States District Court for the Eastern District of Pennsylvania. The United States further requests that the Court, in its transfer order, suggest to the transferee Court that this action may be related to the *qui tam* action captioned *United States, et al. ex rel. Jain v. UHS, et al.*, Civil Action No. 13-6499 (E.D. Pa.), and be subject to such seal and intervention deadline orders as are in place in that related case. A proposed order is enclosed herewith.

Respectfully submitted,

CHAD A. READLER
Acting Assistant Attorney General

BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon

ALEXIS A. LIEN, OSB #110569
alexis.lien@usdoj.gov
Assistant United States Attorney
United States Attorney's Office
District of Oregon
1000 S.W. Third Ave., Suite 600
Portland, Oregon 97204-2902
Telephone: (503) 727-1000

MICHAEL D. GRANSTON
ALLISON CENDALI
MICHAEL KASS
Civil Division
U.S. Department of Justice
601 D Street, N.W., Room 10318
Washington, D.C. 20004
Tel: (202) 305-2068
Fax: (202) 616-4286
Michael.d.kass@usdoj.gov

Counsel for the United States of America

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

UNITED STATES OF AMERICA, *ex rel.*
CARRIE EBORALL,

        Plaintiff,

    v.

UNIVERSAL HEALTH SERVICES, INC.;
CEDAR HILLS HOSPITAL; and UBH OF
OREGON, LLC,

        Defendants.

Case No.: 3:16-cv-02065-YY

**ORDER TRANSFERRING VENUE**

**FILED UNDER SEAL**
Pursuant to the False Claims Act,
31 U.S.C. §§ 3730(b)(2) AND (3)

    Upon consideration of the United States' unopposed *ex parte* motion to transfer venue, and the United States having shown good cause for the requested transfer,

    **IT IS HEREBY ORDERED** that this case be transferred to the United States District Court for the Eastern District of Pennsylvania; and

    **IT IS FURTHER ORDERED** that the Clerk of this Court, in the documents transferring this case to the United States District Court for the Eastern District of Pennsylvania, note that this action may be related to the *qui tam* action captioned *United States, et al. ex rel. Jain v. UHS, et al.*, Civil Action No. 13-6499 (E.D. Pa.), and be subject to such seal and intervention deadline orders as are in place in that related case; and

**Page 1 -  Order Transferring Venue**

**IT IS FURTHER ORDERED** that the complaint, any amended complaints, and all other

filings shall remain under seal during and after the transfer, until further ordered by the United

States District Court for the Eastern District of Pennsylvania, except insofar as that seal has been

partially lifted by the Court.

**IT IS SO ORDERED**, this _5th_ day of _July_, 2017.

YOULEE YIM YOU
UNITED STATES MAGISTRATE JUDGE

Respectfully submitted,

BILLY J. WILLIAMS, OSB #901366
United States Attorney
District of Oregon

NEIL J. EVANS, OSB #965515
ALEXIS A. LIEN, OSB #110569
Assistant United States Attorney

CHAD A. READLER
Acting Assistant Attorney General

MICHAEL D. GRANSTON
ALLISON CENDALI
MICHAEL KASS
Civil Division
U.S. Department of Justice
601 D Street, N.W., Room 10318
Washington, D.C. 20004
Tel: (202) 305-2068
Fax: (202) 616-4286
Michael.d.kass@usdoj.gov

Counsel for the United States of America

**Page 2 -** **Order Transferring Venue**